# UNITED STATES DISTRICT COURT

# DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| Duane Ziemba | : | 3:02CV0258(DFM) |
| v. | : | |
| Lynn Milling, et al | : | February 17, 2005 |

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR SUMMARY JUDGEMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the defendants in the above-captioned matter move for summary judgment in their favor as there is no genuine issue of material fact and the Court can find as a matter of law that the defendants did not exhibit deliberate indifference and that all defendants are entitled to qualified immunity.  As to the plaintiff's claim that he was exposed to extreme cold for several hours at the airport, the defendants assert that the plaintiff did not exhaust his administrative remedies, and thus they are entitled to summary judgment pursuant to the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a).

**I.    FACTS**

**A.    PLAINTIFF'S ALLEGATIONS**

The plaintiff, an inmate acting *pro se*, brings this action against eight defendants "in their individual capacity only":  former Commissioner of Correction John Armstrong (hereinafter "Armstrong"), Director of Classification and Management Fred Levesque (hereinafter "Levesque"), Interstate Compact Director Lynn Milling, former Warden Larry Myers, Lt. Davis, Correctional Officers Matos and Bosquet, and Nurse Patricia Wollenhaupt.  Second Amended Complaint (hereinafter "S. Amd. Com.") ¶¶ 5-11.

1.      **"Background"**

The plaintiff claims generally that the defendants engaged in "terrorism and retaliation" in failing to provide proper timely medical care, use of excessive force, exposure to bitterly cold temperatures, and somehow stealing or denying him legal property thus "denying the plaintiff his right of access to the Court."  S. Amnd. Com. ¶ 1.

As "background" to his allegations, the plaintiff describes time he spent at Northern Correctional Institution (hereinafter "Northern") during which he brought a lawsuit "notoriously well known".  S. Amnd. Com. ¶ 14-15.  The plaintiff alleges vaguely that as a result of this other lawsuit, "the Northern prison officials became extremely hostile towards the plaintiff and inflicted non-stop acts of retaliation against the plaintiff."  S. Amnd. Com. ¶ 17.  The plaintiff does not specify which Northern officials were specifically hostile towards him nor does he provide details as to the time or date or nature of these alleged "non-stop acts of retaliation."  S. Amnd. Com. ¶ 12-16.

The plaintiff then claims that his mother sent then Commissioner John Armstrong  a letter on September 1, 1998, stating that he son was "being destroyed" and that Armstrong was "the only one to stop this travesty."  S. Amnd. Com. ¶ 17.  Again, in this paragraph, the travesty goes unspecified.  In his next paragraph, the plaintiff alleges he personally sent to Armstrong 16 letters between September of 1998 and September of 1999.  S. Amnd. Com. ¶ 18.  The plaintiff claims that all of the letters "specifically informed defendant Armstrong of the continued on-going serious retaliation by his agents against the plaintiff.  And which pleaded for him to as the commissioner step in and remedy the wrong."  S. Amnd. Com. ¶ 18.  Again, "the wrong" goes unspecified in the complaint.

Continuing with broad conclusory allegations, the plaintiff next alleges that because Commissioner Armstrong "is a defendant in the 'Northern' lawsuit 3:98cv2344 he was very specifically informed that his agents were inflicting severe acts of unconstitutional retaliation against the plaintiff." S. Amnd. Com. ¶ 19. Again, not only no specific allegation but no specific date or even broad time period about allegations apparently already addressed in another federal suit. S. Amnd. Com. ¶ 19.

The next allegation is completely without specificity. S. Amnd. Com. ¶ 20. The next allegation provides a time period, the majority of which precedes the applicable statute of limitations for this 2002 lawsuit. In Paragraph 21,[1] the plaintiff alleges, "In 1998 and 1999 the Northern prison officials repeatedly threatened and terrorized the plaintiff" apparently for filing lawsuits and complaints. S. Amnd. Com. ¶ 21. The plaintiff claims that unnamed persons told him on an unspecified date that "Commissioner Armstrong … has put him on the list…he is being transferred out of state where he will be killed. The plaintiff was so terrified he wrote to the CT State Police and filed a complaint against Commissioner Defendant John Armstrong." S. Amnd. Com. ¶ 21.

### 2.    Retaliatory Transfer

The plaintiff next claims, again in vague and conclusory fashion, that "Defendants Armstrong, Milling and Levesque, in sole retaliation they each knowingly, in retaliation planned, ordered and carried out transferring the plaintiff out of the CT. DOC to Nevada on January 20, 2000." S. Amnd. Com. ¶ 23. Despite the "background" allegedly provided above, the plaintiff

---

[1]    A paragraph described later in the Second Amended Complaint as one that should be given "great emphasis". S. Amnd. Com. ¶ 25.

provides no notice, knowledge or motive of any kind to the defendants Levesque or Milling for the plaintiff's transfer. S. Amnd. Com. ¶ 23 et seq. He makes the identical allegation against Armstrong, Milling and Levesque, claiming he was sent out of state "in sole retaliation" for the lawsuits, grievances complaints and letters, although he only previously alleged one lawsuit and letters sent only to Commissioner Armstrong. S. Amnd. Com. ¶ 24.

The plaintiff next alleges that after his transfer, he sent "numerous letters, grievances and request forms" in which "he informed defendants Armstrong, Milling and Levesque of how his transfer …to Nevada 'was in retaliation.'" S. Amnd. Com. ¶ 26. The plaintiff alleges that he further requested that Armstrong, Milling and Levesque "stop the serious retaliation against him." Apparently, this serious retaliation consisted of the plaintiff's remaining in Nevada and away from the Northern correctional officials he claims treated him in some vague fashion that was unconstitutional, and amounted to terrorism.

### 3.    Allegations of Denial of Medical Care

The plaintiff's claims regarding his alleged lack of medical care are equally difficult to pin down. The plaintiff claims that Milling, as the Interstate Compact Director, sent a memorandum dated January 13, 2000, to the defendant Larry Myers, then Warden at Northern, indicating that she had secured placement of the plaintiff with Nevada. S. Amnd. Com. ¶ 27. She requested, "Please make the necessary facility notifications regarding this matter including conferring with medical staff. If there are any medical issues which would preclude his transfer at this time, lease notify my office as soon as possible." S. Amnd. Com. ¶ 27.

The plaintiff alleges that Warden Myers "failed to notify medical staff and failed to confer with medical staff to see if the plaintiff had any serious medical condition that would have

precluded his transfer ten states away to Nevada." S. Amnd. Com. ¶ 28. He claims that Myers "failed to ensure that medical staff saw the plaintiff before his transfer … to determine whether or not any medical issues…precluded his transfer out of state." S. Amnd. Com. ¶ 29. (Of course, Milling had not asked Myers to have the plaintiff *seen* by medical staff prior to his transfer, but rather she had asked to have Myers confer with medical staff.)

The plaintiff further alleges that before he "was transferred to Nevada on January 20, 2000, he had numerous medical requests submitted to defendant Wollenhaupt." S. Amnd. Com. ¶ 30. He alleges that he had filed an emergency grievance on January 1, 2000 in which he claims he was "seeking medical care for his very serious injured back." S. Amnd. Com. ¶ 30. Without specifying the care he feels he should have received or the issue with his back, plaintiff alleges that Wollenhaupt "as the medical supervisor" failed to provide him care for his "seriously injured back." S. Amnd. Com. ¶ 30.

The plaintiff claims that he wrote the defendant Armstrong about this alleged intentional denial of medical care for his back, but Armstrong did not "act on all of the information and fail[ed] to remedy the wrong." S. Amnd. Com. ¶ 31. The plaintiff claims that this alleged failure to provide medical care was the result of Armstrong's agents retaliating against the plaintiff, alleging conspiracy in Armstrong's actions which allegedly "approved and promoted" this alleged lack of medical care. S. Amnd. Com. ¶ 31. The plaintiff further claims that his back was "further injured" on his trip to Nevada as a result of the failure to provide him with medical care for his "very seriously injured back" prior to his transfer. S. Amnd. Com. ¶ 32.

### 4.    Allegations of Excessive Force

The plaintiff's makes some allegations regarding excessive force which are again vague and attributed to no one in particular.  S. Amnd. Com. ¶ 33.  He claims that the following occurred on the morning of his transfer:

> Armstrong's Northern agents and terrorists, they woke up the plaintiff and lied to him by telling him he is going to the A/P [Admitting and Processing] room to have a new ID made.  They were hostile and violent, they put full restraints on the plaintiff and escorted him to the A/P room.  Once in the A/P room they locked him in a cell and stated:  "Do you really want to know why you['re] here?"  Thereafter, they terrorized the plaintiff and told him that he is going to Mexico, will be killed, and he is going to be sorry for suing them.

S. Amnd. Com. ¶ 33.

The plaintiff makes no allegation about how this alleged behavior can be attributed to former Commissioner John Armstrong, nor does he state the nature of the alleged violence that was visited upon him by unnamed perpetrators.  S. Amnd. Com. ¶ 33.  The plaintiff does not explicitly allege "conspiracy" in the complaint.

The plaintiff also makes excessive force allegations against the defendants Davis, Matos and Bosquet.  S. Amnd. Com. ¶ 34.  Without specifying who did what, the plaintiff claims that the three "each either used excessive force on the plaintiff or acted with deliberate indifference by failing to intervene."  S. Amnd. Com. ¶ 34.  The excessive force in this instance was allegedly putting restraints on the plaintiff "intentionally too tightly and in excess of what was necessary."  S. Amnd. Com. ¶ 34.  He does attribute a statement to the defendant Bosquet:  "Put them cuffs on him tightly, he's a f****** a****** suing us and we are going to get rid of him."  S. Amnd. Com. ¶ 35.

The three transportation defendants, Matos, Davis and Bosquet, are further claimed to have then acted with deliberate indifference when plaintiff requested medical attention for his

back.  S. Amnd. Com. ¶ 36.  They further allegedly ignored his repeated requests to loosen the restraints during the van ride from Somers Connecticut to a New York airport.  S. Amnd. Com. ¶ 37.  The plaintiff claims that "as a result of the excessive force by defendants Davis, Matos and Bosquet, the bellychains that went around the plaintiff's back, <u>deeply cut into his spinal column and inflicted excruciating pain and permanently damaged his back further</u>."  S. Amnd. Com. ¶ 38.  The plaintiff also claims that his wrists and hands suffered permanent "nerve damages" as a result of being cuffed too tightly during this transport.  S. Amnd. Com. ¶ 38.

The plaintiff then claims that once at the airport, the three transportation defendants forced him to stand outside in bitterly cold temperatures "for several hours" wearing only an inmate jumpsuit.  S. Amnd. Com. ¶ 38.  The plaintiff claims that he was threatened with the following—"if he did not stand there (outside) or if he moved, he'll be shot dead."  S. Amnd. Com. ¶ 39.  As a result, the plaintiff claims he suffered an ear infection which caused him pain over the next three weeks during plane trips ultimately bringing him to Nevada.  S. Amnd. Com. ¶ 39.

**5.  Allegations of "Stolen and Denied Legal Material"**

Once again, the plaintiff makes allegations against persons he does not even name, let alone sue as a defendant in this matter.  The plaintiff claims that "On January 20, 2000, the plaintiff was transferred out of Northern and that unnamed 'Northern prison official kept all of his legal material property and refused to transfer it with the plaintiff.'"  S. Amnd. Com. ¶ 40.  The Plaintiff claims that he sent numerous letters to the defendants Director Milling, then Warden Myers and former Commissioner Armstrong.  S. Amnd. Com. ¶ 42.  He claims that he needed five boxes of legal material "immediately.".  S. Amnd. Com. ¶ 42.  The plaintiff claims

that he did not have his legal material from January 20, 2000, until April 5, 2000.  S. Amnd. Com. ¶ 42.

Always speaking in conclusory terms, the plaintiff claims that Armstrong, Lynn Milling and Myers intentionally withheld his legal material  in retaliation for his many lawsuits.  S. Amnd. Com. ¶ 43.   The plaintiff further claims that when his boxes did arrive in Nevada on April 5, 2000, some of the material was missing and "only the defendants *and their agents* could have stolen because the boxes were still sealed from CT"  S. Amnd. Com. ¶ 44.  Again, the plaintiff lists no names and has no allegation specific to any of the defendants.

The plaintiff claims that two specific cases were damaged as "essential … affidavits" and other documentary evidence was missing.  S. Amnd. Com. ¶ 44.  The plaintiff also claims that he had been prepared to file several meritorious 1983 actions regarding excessive use of force but "these case[s] were stolen and cannot now ever be filed.  Because the plaintiff cannot ***recall*** the defendants' names, or the dates of the incidents, or the facts in each case."  S. Amnd. Com. ¶ 46 (emphasis added).  The plaintiff also claims that a habeas corpus action was likewise damaged. S. Amnd. Com. ¶ 46.

### 6.    Allegations of Lack of Access to Court in Pending Connecticut Matter

The plaintiff goes on at length about a habeas corpus matter in New Haven Superior Court.  The plaintiff claims that the matter was prejudiced as he was unable to return to Connecticut to prosecute his habeas for nearly a year.  S. Amnd. Com. ¶ 48.  The plaintiff claims to have sent numerous letters and grievances notifying the defendants about this matter all to no avail.  S. Amnd. Com. ¶ 48.

### 7.    Transfer to "Most Dangerous Prison"

The plaintiff claims that Armstrong, Milling and Levesque "intentionally, maliciously, carefully searched to find the most dangerous prison in the country to sent the plaintiff to."  S. Amnd. Com. ¶ 49.  Not surprisingly, the plaintiff allegedly wrote several letters and grievances informing them that his life was threatened and that "the Nevada guards are gun happy they shoot inmates for unjust reasons.  With live bullets."  S. Amnd. Com. ¶ 50.  The plaintiff claims that on January 9, 2002 he was shot in three places, the back of his head, his back and his side.  S. Amnd. Com. ¶ 52.  The plaintiff claims he was shot as a bystander when Nevada correctional officials shot at two inmates fighting.  S. Amnd. Com. ¶ 52.

## B.  DEFENDANTS' FACTUAL SUMMARY JUDGMENT PRESENTATION

### 1.    Transfer of Plaintiff

The plaintiff has been in and out of the custody of the Department of Correction (hereinafter "DOC") for many years.  **Ex. A DOC RT 60 Screen.**   The plaintiff first entered prison in 1984 and began increasingly longer periods of incarceration thereafter.  **Ex. A.**   In 1997, the plaintiff escaped from DOC custody while on Community Release status, and was subsequently returned to the custody of the Department of Correction with additional charges including larceny.  **Exs. A; E Inmate Master File portions; V Transport Request Package.**  Since 1997, Ziemba has continuously been in the custody of the Connecticut Commissioner of Correction.  **Ex. A.**   His current sentence does not expire until June of 2013.  **Ex. C RT 50 screen.**

To say that the plaintiff has been a management problem for DOC officials would be an understatement.  The plaintiff has received 62 Disciplinary Reports during his incarceration,

receiving his a Disciplinary Report for Destruction of Property the day just prior to his transfer to Nevada. **Exs. D, RT 67; A.** The plaintiff's disciplinary history includes being found guilty by the Department of Correction of Assault on a DOC employee, three charges of Attempted Assault on a DOC employee, fighting, numerous times being found guilty of threats, numerous times being found guilty of interfering with safety and security, and attempted escape in an incident separate from his escape from Community Release. **Exs. A; D; E.**

The plaintiff's initial terms of incarceration from 1984 until 1997 were relatively calm. **Exs. A; D.** Despite serving 5 separate periods of incarceration prior to being returned from his escape from Community Release in 1997, with those five separate periods totaling approximately six years and 9 months, the plaintiff received only 7 Disciplinary Reports prior to September of 1997. **Exs. A; D.** In September of 1997, while housed at Cheshire, the plaintiff incurred Disciplinary Reports for fighting and Interfering with Safety and Security. **Exs. A; D.** On this date, the plaintiff refused to exit the shower and barricaded the shower entrance with plastic chairs. **Ex. E, 139; F, Administrative Seg. file.** At this point, the plaintiff was temporarily transferred to Northern for a period of little over a month then back to a lower security level facility. **Ex. A.** While at Northern, the plaintiff received a hearing regarding placement in Administrative Segregation ("AS") at Northern, and his placement at Northern at that time was not authorized. **Ex. E.** The plaintiff was warned at this point in time however, that "any additional Disciplinary Reports would result" in a review of his status. **Exs. E 139; F.** At this point the plaintiff started regularly incurring Disciplinary Reports at various facilities, garnering 10 Disciplinary Reports in a period of 7 months. **Exs. A; D.**

On August 11, 1998, the plaintiff attempted to escape, destroying the ceiling to his cell at Garner by kicking it and tampering with a fixture in the ceiling as well flooding the cell and ripping the toilet out of the floor and using pipes from the toilet to hit the window to the cell. **Exs. D, E 139; F; T 524.**   The plaintiff had previously received criminal charges for a different escape, ultimately resulting in time being added to his term of incarceration.   **Ex. L, Transfer Request Package.**   On the same day he destroyed date, 8/11/98, the plaintiff was again transferred to Northern.   **Ex. A.**   Despite being placed in the Phase Program at Northern in an effort to control his behavior, the plaintiff continued as a management problem at Northern.   **Ex. E.**

The plaintiff continued to receive numerous Disciplinary Reports and be receive sanctions for the same at Northern throughout the remainder of 1998 and through 1999.   **Exs. D, E.  186-243.**   In November of 1998, the plaintiff was sentenced to a much longer sentence than previously, which certainly did not positively impact his institutional behavior.   **Exs. A; E 244; G 3/31/99 Letter from Dudley to Levesque.**   In September of 1999, the plaintiff had another significant incident, and was internally charged with and convicted of  multiple counts of Attempted Assault on an Officer as well as other charges.   **Exs. D; E, 186-207.**   During this incident the plaintiff swung at Correctional Officers despite being restrained and was spitting. **Ex. E 198, 204.**

The plaintiff proved adept at slipping his restraints, including handcuffs, having to have them applied multiple times, breaking them on at least one occasion and attempting to break them on another.   **Ex. E 186, 187.**   As he did so frequently, the plaintiff fought his disciplinary charges, pleading not guilty and appealing them all, typically accusing staff of a variety of

improper behavior.  **Ex. E, 186-207.**  The plaintiff garnered yet another ticket in October of

1999 on a charge he incurred frequently, Interfering with Safety and Security  **Ex. D.**

Months before the plaintiff's series of disciplinary infractions in September and October

of 1999, however, the wheels had been set in motion to transfer the plaintiff out of Connecticut

due to the severe management problem he posed.  On March 31, 1999, then Deputy

Commissioner Coyle, who is not a defendant in this matter, issued instructions in a letter by

Correctional Counselor Dudley to Director Levesque, who is a defendant in this matter.  **Exs. G;**

**H, Milling Aff.; O Levesque Aff.**  The letter stated:

> Per instructions from Deputy Commissioner Coyle, I am requesting that the
> process be initiated to transfer inmate Duane Ziemba …. to another jurisdiction.
>
> Inmate Ziemba was sentenced for the final time on November 18, 1998, bringing
> his total effective sentence to eighteen years, six months.  Presently he has no
> litigation pending with the State.
>
>
> In previous investigations, he has stated that he has no intention of complying
> with the programming offered at Northern.  He continues to display an extremely
> hostile and uncooperative attitude toward staff and has jeopardized the safety and
> security of numerous facilities throughout the State.  We feel that this move
> would not only benefit his personal safety, but also that of the Department.

**Ex. G.**

Then Deputy Commissioner Coyle supervised the defendant Director Levesque, who did

then and continues to supervise Major Milling, also a defendant, who manages the Interstate

Compact Office for the Department of Correction.  **Ex. H.**  In a handwritten note by Levesque to

Milling which is contained on the only available copy of Ms. Dudley's letter, Levesque instructs

Milling:  "Lynn—Please prepare package, advise Coyle, CC Dudley".  **Exs. G; H; O.**  By this

instruction, Milling understood that she was to prepare a Transfer Request Package regarding

Ziemba to go to other states to see if any were willing to accept Ziemba as an inmate pursuant to

the Interstate Corrections Compact.  **Ex. H.**  Connecticut is a party to this compact along with numerous other states.  **Ex. H.**  The compact allows for participating states to move inmates among the states for a variety of reasons.  **Ex. H.**  Participating states agree to treat transferred inmates in accord with state and federal law and transfers pursuant to this Compact are common. **Ex. H.**

Deputy Commissioner Coyle's statement on March 31, 1999, that the plaintiff had no pending litigation against the State at that time, was accurate.  Exhibit I is a computerized printout of state court civil litigation initiated by persons named Ziemba going at least back to 1997.  **Ex. I.**  That document reflects only two state court actions by Ziemba, one initiated in 2001 and one initiated in 2004.  **Ex. I.**  As for federal litigation, Exhibit J is a print out of all of the plaintiff's litigation in federal court reflecting 13 cases.  **Ex. J.**   Only four of those cases were brought prior to the year 2000, and a review of the docket sheets for those matters indicates that orders by the court directing the plaintiff to complete and return US Marshal 285 forms were not issued in any case until at least May of 1999.  **Ex. K.  Thus, the decision was made to transfer the plaintiff long before a single one of his many lawsuits were ever served, and could not have been in retaliation for any lawsuit filed by the plaintiff.**

Milling sent an email to Correctional Counselor Sicilia on April 9, 1999, again before any lawsuits were served,  re "ziemba, duane 128963", reiterating that the Deputy Commissioner Coyle had made the decision to transfer Ziemba:  "Fred received notification from Mr. Coyle's office that we shoul [sic]  pursue an involuntary transfer."  **Ex. N Transfer Communications.**

Pursuant to Levesque's instruction, Milling did assemble a package to be distributed to other states.  **Exs. H; L.**  Milling sent a cover letter with the package to four states, Nevada,

Florida, Oregon and Arizona.  **Exs. H; L.**  The letters went to Oregon and Arizona on June 17,

1999.  **Exs. H; L**.  On July 21, 1999, Oregon indicated its unwillingness to accept Ziemba.  **Exs.**

**H; M Transfer Request Correspondence.**  Milling made a note on the copy of the letter to

Arizona which states, "7/26/99 Per Call to AZ—slow in reviewing case  LM"  **Exs. H; L**.

Having received no positive response from either Arizona or Oregon by August 2, 1999, Milling

sent the same package with a cover letter to Nevada and Florida..  **Exs. H; L.**  As she had done

previously, Milling noted Ziemba's poor institutional history as well as his history of escape

attempts.  **Exs. L; M.**   In internal communication to her staff, Milling had requested that the

packages go out to Florida and Nevada and had further indicated the issue was not urgent, stating

"not a drop everything."  **Exs. N; H.**

On August 17, 1999, Nevada corresponded with Milling, who received word on August

23, 1999 that Nevada would agree to accept Ziemba.  **Ex. R, 8/17/99 letter.**  By August 25,

1999, Milling sent a letter to Arizona indicating that "[O]ur above referenced inmate has been

accepted by another state under the provisions of the Interstate Corrections Compact

Agreement."  **Ex. M.**   This exchange of correspondence indicates that, despite plaintiff's

allegations, Nevada was one of several states contacted with regard to his transfer, and was not

specifically sought out for any reason, nor was it even Connecticut's first request.  Plaintiff's

claims that he was sent to Nevada as it is the most dangerous prison in the country in order for

him to be killed is not even remotely credible and is purely speculative, with no basis in fact

whatsoever.

On October 14, 1999, Milling corresponded with Nevada, stating that "Ziemba has been

medically cleared to be transferred.  He recently had foot surgery and is wearing a special soft

shoe.  He can only bear weight on his right heel.  However, according to our medical unit, this is

a temporary condition and he does not have any follow up appointments.  We will be making

arrangements to move Mr. Ziemba to Nevada."  **Ex. S 10/14/99 letter.**

On January 13, 2000, as plaintiff alleges, Milling communicated with Northern's Warden

at the time, defendant Larry Myers.  **Ex. S, 1/13/00 letter.**  Milling indicated that placement for

the plaintiff with Nevada had been secured and gave instructions to the Warden as to the travel

arrangements.  **Ex. S.**  Milling requested as follows:

> Please make the necessary facility notifications regarding this matter including
> conferring with medical staff.  If there are any medical issues, which  would
> preclude his transfer at this time, including transfer by plane, please notify my
> office as soon as possible.  An updated Health Services Transfer Summary form
> should be completed and any pertinent medical/medications issues should be
> addressed.  If Mr. Ziemba requires medication, please see that a two-week supply
> is sent with him upon transfer.

**Ex. S.**

In completing the transfer process, Milling was carrying out instructions by her superior

and had no retaliatory or any other improper motive whatsoever.  **Exs. G; H.**  Milling was

unfamiliar with Ziemba, having never had any direct contact with him prior to his transfer and

having no reason to wish him ill.  **Ex. H.**

Levesque had even less to do with the transfer process, as all he did was pass Deputy

Commissioner Coyle's instructions on to Milling.  **Ex. O.**  Levesque was familiar with Ziemba

as a management problem, but had never had any direct contact with him prior to his transfer and

had no reason to wish Ziemba ill.  **Ex. O.**

While the defendant Commissioner Armstrong did not order the transfer of the plaintiff

to Nevada, he was aware of and approved the decision to transfer the plaintiff to another state

based upon the plaintiff's poor institutional history and the safety threat he posed to staff.  **Ex. P,**

**Armstrong Aff.**  It is often the case that an inmate who has exhibited extremely negative behavior in one state's correctional setting takes advantage of a fresh start with unfamiliar staff and inmates to improve his behavior.  **Ex. P.**  Such a transfer also gives Connecticut correctional staff a break from the plaintiff's destructive or threatening behavior.  **Ex. P.**  The transfer of the plaintiff was not to retaliate against him for any exercise of any First Amendment rights.  **Exs. H; O; P.**

The plaintiff was ultimately transferred back to Connecticut on March 28, 2002.  **Ex. A.** He promptly complained to the Commissioner that his life was in danger in Connecticut at the Cheshire Correctional Institution, where he remained for two months before again being transferred back to Northern.  **Exs. Q, 4/5/02 letter; A.**  Despite the many alleged threats to his life and his safety prior to, during and after his stay in Nevada, the plaintiff is now living at Garner Correctional Institution.  **Ex. A.**

> **2.**    **Medical Issues Surrounding Transfer**
>
> **a.**    **As to Nurse Patricia Wollenhaupt**

As set forth above, Milling corresponded with Nevada months before the transfer in January of 2000, stating on October 14, 1999, that "Ziemba has been medically cleared to be transferred.  He recently had foot surgery and is wearing a special soft shoe.  He can only bear weight on his right heel.  However, according to our medical unit, this is a temporary condition and he does not have any follow up appointments.  We will be making arrangements to move Mr. Ziemba to Nevada."  **Ex. S 10/14/99 letter.**

Plaintiff's medical records do not indicate any significant problem with plaintiff's back. **Exs. T; U.**  In March of 1998, long before his placement at Northern, yet while in custody,

plaintiff's back was x-rayed twice with two different views after an altercation with an officer, and other x-rays to rule out back problems followed.  **Exs. T, Med. Records 190, 191, 192, 222, 224, 311, 313, 315; U, Blanchette Aff.**  This altercation predated plaintiff's transfer to Nevada by 21 months.  **Exs. T 311; A; U.**    The conclusion reached by one radiologist was "Minimal anterior wedging of what appears to be T7, ? old Scheuermann's disease."  **Exs. T 190; U.**  Scheuermann's disease is a condition formed during growth years when the front of a disc or discs in the back do not grow at the same pace as the back.  **Ex. U.**  The radiologist reading the report also said that the *minimal* wedging he noted could also be the product of trauma.  **Exs. T 190; U.**  Earlier that same month, another radiologist reported that several "views of the lumbosacral spine reveal no evidence for acute fracture or dislocation.  No subluxation is evident."  **Exs. T 191; U.**  Also on that date the radiologist concluded "No acute abnormality of the lumbosacral spine."  **Exs. T 192; U.**   He also noted "*mild*" narrowing at the cervical portion of the plaintiff's spine, but again concluded, "No acute fracture, subluxation or dislocation evident."  **Exs. T 192; U.**

In April of 1998, approximately one month later, additional x-rays of the plaintiff's back (and sinuses) were taken.  **Exs. T 189; U.**  The conclusion again with regard to the Thoracic spine was "No significant interval change".  **Exs. T 189; U.**  In May of 1998, a doctor ordered x-rays of plaintiff's back and the plaintiff complained about the x-rays.  **Exs. T 222; U.**  The plaintiff argued with medical staff that month, May of 1998, about the cause of his alleged back problems.  **Exs. T 221; U.**

The plaintiff's doctor noted in May of 1998 that there were no acute changes on spinal x-rays but that the plaintiff was "unsatisfied with NSAID [anti-inflammatory medicine; Motrin]

and bedrest." **Exs. T 224, 228; U.**  The treatment plan for plaintiff at that time was to continue conservative management and seek an orthopedic consult if an "adverse clinical change occurred." **Exs. T 224; U.**   The doctor reporting indicated with regard to the plaintiff, "He feels pain is being ignored.  Litigation is highly likely." **Exs. T, 228; U.**

In June of 1998, plaintiff complained to medical staff, "You had x-rays of my back taken and told me they show nothing wrong.  I am again telling you something is seriously wrong." **Exs. T 217; U.**  Medical staff responded that the plaintiff had been seen 5 times from March to May of 1998 and had as of the last visit reported being comfortable after Motrin.  **Exs. T 217; U.**

None of the defendants, including Nurse Wollenhaupt, the only medical staff defendant, were involved in any of decisions regarding treatment for the plaintiff's alleged back pain, although Nurse Wollenhaupt did respond to many of plaintiff's written requests regarding his alleged back pain and other issues by noting that the plaintiff had been seen by a doctor regarding his alleged back pain.  **Exs. T 218, 220, 221, 222, 223, 236, 238, 23, 240, 241, 242, 248, 249, 250, 251, 252, 253, 254 259, 273, 288, 289; U.** While there is certainly ample evidence that plaintiff complained about a back problem in 1998 and thereafter, there is likewise ample documentation that plaintiff was seen and treated for his alleged back problems by medical staff, that his problem was not ignored, Motrin and Tylenol were prescribed, and no acute or serious back injury was ever determined to exist.  **Exs. T 189, 190, 191, 192,  217, 218, 220, 221 222, 223, 228, 232, 236, 238, 239, 240, 241, 242, 248, 249, 250, 251, 252, 253, 254, 259 273, 288, 289, 301; U.**  In terms of plaintiff's condition as perceived by medical staff, aside from his verbal complaint, the following was noted:

No change in x-ray findings.
Lumbar spine, no vertebral tenderness

No limp in walk
Lumbar pain L [left] sided more than thoracic spine level pain

**Exs. T 304; U.**  These objective findings do not support plaintiff's claims about a serious back condition being mistreated by the application of restraints in the back.  **Ex. U.**  Indeed, handcuffing a person in the back stretches the front, chest muscles, but would have no impact on the back one way or another.  **Ex. U.**

On April 20, 1998, while at MacDougall-Walker Correctional Institution, the plaintiff wrote an Inmate Request Form in which he stated, "**I refused a medical trip today because my back seriously hurts.**  It is not humane for belly-chains to be raped [sic]  around my back with padlock behind my back.  I was 3:00 AM forced to refuse trip for this reason.  I am trying to heal not be hurt worse.  Can this be rescheduled with restraints being used anyway but raped [sic] around my back.?"  **Exs. A; T 253; U.**   Nurse Wollenhaupt stated to the plaintiff in response to his requests for , "Unfortunately, we can not deviate from the Administrative Directive.  You have no gross documented anomalies of the back.  We will try to rebook it if you agree to go according to the Administrative Directive."  **Exs. T 253; U.**

Interestingly, plaintiff's request to be transported to a medical appointment at an "outside" hospital, UConn, with less restrictive restraints due to a purely subjective back problem predated by only months his escape attempt in August of 1998, and came after his criminal escape from DOC community placement.  **Exs. T 253; D; E 139; F.**

In May of 1998, Dr. Silvis, not a defendant in this matter, noted the plaintiff, still at MacDougall, was "Upset because I noted in chart he refused to go to UCONN wearing certain restraint—This is simply a well documented fact that can not be covered-up to help I/M [inmate] Ziemba in his personal use of his medical file."  **Exs. A; T 296; U.**  The doctor further noted on

that date that he had requested an orthopedic visit for the plaintiff "because  unsatisfied." **Exs. T 297; U.**  The doctor further noted, "Back pain complaints have been on-going since initial assault.  No change in x-rays c/ [with] no fx [fracture] ever seen." **Exs. T 297; U.**

On a separate occasion in May of 1998, the plaintiff indicted to other medical staff that "He had not issues about the restraints except that he asked custody staff to be 'reasonable'" **Exs. T 301; U.**  While in April of 1998, medical staff felt the plaintiff might have experienced a muscle spasm in his back, staff charted that the plaintiff himself aggravated this by working out. **Exs. T 307; U.**   Medical staff prescribed Motrin and Naproxen for plaintiff's pain from April through July of 1998.  **Exs. T 390-392; U.**

In August of 1998, the plaintiff's back was functioning well enough that he was able to rip the toilet off of the floor or wall of his cell at Garner, break a fixture in the ceiling and crawl up into the ceiling.  **Exs. T 355, 540, 541; D; E 139; F; A; U.**  The plaintiff was also able to destroy three sets of handcuffs at this time, breaking two sets at one time.  **Exs. T 505, 541; U.** This was considered an escape attempt.  **Ex. D.**  At this point in time, the plaintiff was restrained and medical checked on him frequently, typically every two hours.  **Exs. T 492-502; U.**  During all of these checks, the plaintiff made no complaints of back pain, and medical staff noted on more than one occasion, "No c/o [complaints of] discomforts and no obvious s/s [signs or symptoms] of distress."  **Ex. T 492-502.**  The plaintiff was transferred to Northern at this time. **Ex. A.**  On September 8, 1998, plaintiff complained to staff that his back was not getting better and he was referred to "Sick Call" which is how inmates make a medical appointment.  **Exs. T 485; U.**   Also in September of 1998, another x-ray was taken of plaintiff's back.  **Exs. T 517; U.**

The results were provided by UConn radiology, who noted, "Some degenerative changes, no acute disease." **Exs. T 517; U.**

Clinical notes from September 11, 1998, reflect an extensive exam of plaintiff's complaints as related to his back vis-à-vis objective factors related to back pain. **Exs. T 519, 520; U.** Seeing Nurse Clark, the plaintiff complained as follows:

> C/O [complains of] back pain since August 12th – c/o lower back pain that goes
> down my right leg. I/M states previous hx [history] of back problems c/ [with]
> hospitalization for back on March of 1998.

**Exs. T 520; U.**

Obviously, this was a fabrication as the plaintiff's records from 1998 do not support any such "hospitalization for back on March of 1998." **Exs. T 190-220; U.** Nurse Clark further noted, "gait observed steady; **I/M slowly becoming verbally aggressive and demanding stating that he needs to be cuffed in front because he is 'so tall and my back hurts.'"** **Exs. T 520 (emphasis added); U.** The plaintiff wanted to be cuffed in front a month after destroying a cell and mechanical restraints. **Exs. T 253; U.** Cuffing certain inmates in front is considered a potential security risk as inmates can swing the cuffs about, causing injury, and inmates have been known to attempt to strangle another or otherwise cause harm when cuffed in front. **Ex. H.**

Nurse Clark noted as follows:

> Sick call process explained to i/m [inmate] and his hx [history] of refusing to see
> the MD also discussed c/ i/m [with inmate]. **No obvious distress or extreme
> discomfort noted; I/M denies being able to bend over to remove his sock for
> nurse to examine foot however custody staff reports that I/M is able to dress
> self and tend to … [illegible] c/ [with] no requests of assistance;**
> As stated, inmate denies exercising in cell but muscle tone noted to be good;
> **I/M also initially stated that he was unable to move his toes but then stated he
> could move them; I/M noted to be able to propel body on and off exam table
> s/ [without] assistance and no c/o [complaints of] discomforts.   I/M noted to
> bend at waist to sign inmate fee form c/ no c/o.**

**Exs. T 519 (emphasis added); U.**

Nurse Clark concluded as follows: **"P) [Plan:]  Continue c/ [with] cuff status in back per custody protocol." Exs. T 519 (emphasis added); U.**

In late September of 1998, the plaintiff engaged in behavior leading correctional staff to extract him from his cell, behavior unlikely for someone with severe back pain. **Exs. T 483; U.** At this point in time, the plaintiff complained of "internal bleeding" which was never substantiated, but did not complain of back problems and "denie[d] any other medical concerns/issues." **Exs. T 483, 484; U.**

In October of 1998, the plaintiff complained of several issues, including his back. **Exs. T 515; U.** Medical staff noted at that time that the plaintiff had **"full mobility, able to amb[ulate] c/o [without] difficulty, [Zero] s/o [signs of] trauma." Exs. T 515; U.** The plaintiff was given Motrin at this time. **Exs. T 515; U.**

In February of 1999, the plaintiff complained of back pain and was seen by medical staff. **Exs. T 518; U.** Staff referred the plaintiff to the September 1998 x-rays, and the plaintiff requested follow-up x-rays, and was referred to "MDSC", sick call with a doctor. **Exs. T 518; U.**

On March 4-5, 1999, the plaintiff was again in four-point restraints and thus assessed by medical staff at Northern. **Exs. T 456, 458; U.** The plaintiff did complain of lower back pain at this time, on some of the medical checks he received, along with numerous other issues, although he did not always complain of back pain at this time. **Exs. T 456-467, 476-477; U.** On March 9, 1999, the plaintiff had a physical incident with correctional staff after refusing an order and several medical issues were reported, none of which included his back. **Exs. T 422; U.**

A different nurse than the defendant, Nurse D. Kindness, completed the transfer summary with regard to the plaintiff on the date before his transfer. **Exs. T 574; U.** A medical transfer summary report is completed by reviewing a patient's medical records to note any significant medical history or current conditions or problems. **Exs. X, Wollenhaupt Aff.; U.** Nurse Kindness noted for the plaintiff's "Current Conditions/Problems" that he had "Chronic/Varied/Non-Specific Complaints". **Exs. T 574; U.** Nurse Kindness noted the plaintiff's "Significant Medical History" as follows: "Cheilectomoy R [right] foot 9/99, Mental Health Issues, Fx [fracture] Nose '97". **Exs. T 574; U.** By completing this transfer summary, it was Nurse Kindness, not the defendant Nurse Patricia Wollenhaupt, who conducted the final review of plaintiff's medical history prior to his transfer. **Exs. X; U.** As this transfer summary was completed, the request by Milling to Myers that medical issues be checked was carried out. Obviously, Nurse Kindness noted no significant back injury nor did she note that any special treatment of the plaintiff's back was necessary, nor did she undertake any action to stop the plaintiff's transfer for a medical reason, as none was indicated in his medical chart. **Exs. X; U.** There is no DOC policy or medical necessity for an inmate to be seen prior to a transfer out-of-state. **Exs. U; X; U.** It is DOC policy that an inmate's medical records are reviewed and a transfer summary prepared prior to transfer. **Exs. U; X.**

Nurse Kindness had also done a chart review and transfer summary on October 12, 1999, two days prior to Lynn Milling's letter to the Warden stating that the plaintiff had been medically cleared for transfer. **Exs. S; T 575; U.** Also at this time, Nurse Kindness noted no significant back injury and did note the foot fracture. **Exs. T 575; U.** Another Nurse, Virginia Turner, had also completed a chart review and transfer summary regarding the plaintiff in April of 1999.

23

**Exs. T 576; U.**  At this time, Nurse Turner noted a nasal fracture and foot issues for the plaintiff, but did not note any back injury or special treatment necessary with regard to plaintiff's back. **Exs. T 576; U.**  The same was true on August 11, 1998 by a different nurse.  **Exs. T 577; U.** Different nurses, again not including Nurse Wollenhaupt, completed transfer summaries for the plaintiff in 1998, noting only that the plaintiff had a history of "back pain complaints" but noting no objective back injury.  **Exs. T 578; 579; U.**  Nurse Wollenhaupt never cleared the plaintiff for transfer nor did she complete any transfer summary reports for the plaintiff.  **Exs. X; U.** Qualified personnel did clear the plaintiff for his transfer to Nevada, and there was no medical reason for anyone, including Nurse Wollenhaupt, to intervene at any time.  **Exs. U; X.**

The plaintiff's obviously lengthy medical chart reveals that he was seen frequently by various medical staff, including doctors, nurses and other professional on a frequent basis.  **Exs. T; U; X.**  Nurse Wollenhaupt was certainly entitled to rely on the assessments of various medical staff, and as a nurse, was not in a position to second-guess the orders or assessments of physicians or other medical personnel who had physically examined the plaintiff.   **Ex. U; X.** Although Nurse Wollenhaupt was involved in answering the plaintiff's many grievances regarding his medical care, she was not responsible for medically clearing him for transfer, for the conditions of his transfer, or for making decisions about how to handcuff the plaintiff.  **Ex. X.**  A review of the plaintiff's medical records reveals no objective back injury or any clinical reason to handcuff him in front, or any condition that should prevent him from car or air travel. **Exs. U; T; X.**

When the plaintiff arrived in Nevada, he continued to complain of an alleged back injury from 1998.  **Ex. W, 12/28/00 correspondence.**  Prior to ever receiving any medical records

from Connecticut, the doctor in Nevada opined, "[P]art of his problem is that he is trying to get drugs, and they are not giving them to him.  He is receiving medication for the pain, but not heavy duty  drugs."  **Ex. W.**   While the plaintiff was in Nevada, he did continue to complain of back pain but no treatment other than Tylenol or Motrin was prescribed, and the plaintiff was never restricted in being restrained or in travel in any way by any medical professional in Nevada.  **Exs. T 651-840; U.**  Thus, no doctor, nurse or other medical professional in either Connecticut or Nevada has ever diagnosed the plaintiff with any back condition which would prohibit him from traveling, and Nurse Wollenhaupt never ignored any serious medical need of the plaintiff.  **Exs. T; U; X.**  The plaintiff's alleged back pain does not constitute a "serious medical condition".  **Exs. T; U.**  Even the plaintiff did have a serious medical condition, as set forth above, Nurse Wollenhaupt had no personal involvement in clearing the plaintiff for transfer, nor did she have any responsibility in that regard.

### 3.      Claims as to Transport Personnel

#### a.      Alleged Excessive Force

The plaintiff claims that the three transport defendants, Matos, Bosquet and Lt. Davis put restraints on too tightly during his transport.  He alleges that this "cut… into his spinal column" and caused nerve damage to his hands.  The plaintiff's medical records from Nevada in no way support these medical allegations.  There is no indication whatsoever of any serious spinal column injury or any spinal injury at all to the plaintiff before or after his transport to Nevada in his medical records from either Nevada or Connecticut.  **Exs. T; U.**  Nor is there any single entry in the plaintiff's voluminous medical records from both Nevada and Connecticut in which the plaintiff seeks medical care related to nerve problems with his hands or wrists.  **Exs. T; U.**

The plaintiff's Nevada medical records include a "Master Problem List" starting with his arrival in February of 2000.  **Ex. T 643.**  This list mentions only reported back pain from the "3/1998 injury", the right foot, and "[decreas]ed hearing in left ear."  **Exs. T 643; U.**

No ear infection or recent back injury or hand injury is noted whatsoever.  **Exs. T 643; U.** Indeed, the February 8, 2000 intake notes states "Hx [history] per i/m [inmate]:  ***Back injury prior to incarceration."*** **Exs. T 643 (emphasis added); U.**   In June of 2000, medical professionals noted with regard to the plaintiff's alleged back pain that it was his or her assessment:  "muscular/skeletal back pain  …subjective complaints only—no objective physical exam findings."  **Exs. T 652; U.**

The plaintiff cannot substantiate his claims that he was transported with excessive force or that he sustained any physical injury from the manner in which he was transported in January of 2000.

### b.       Claim Regarding Exposure to the Elements

The plaintiff claims that he was forced to be out in the cold in only an inmate jumpsuit for "several hours" which caused him to get sick and suffer an ear infection. There is no indication whatsoever of any ear infection caused by exposure to the elements on January 20, 2000 in the plaintiff's medical records from Connecticut or Nevada.  **Ex. T; U.**  The plaintiff's Nevada medical records include a "Master Problem List" starting with his arrival in February of 2000.  **Ex. T 643.**  This list mentions only the reported back pain from the "3/1998 injury", the right foot, and "[decreas]ed hearing in left ear."  **Exs. T 643; U.**

No ear infection is noted whatsoever.  **Exs. T 643; U.**  In fact , both of plaintiff's ears were examined on February 8, 2000 and determined to be "WNL [Within normal limits]" with

"0 edema [no swelling]".  **Exs. T 653; U.**  Most importantly, the doctor in Nevada stated on

February 15, 2000, "*No evidence of infection."*  **Exs. T 653; U.**  The earlier health assessment of

the plaintiff done upon arrival on February 8, 2000 in Nevada showed the ears to be "normal."

**Exs. T 736-737; U.**

**c.     Claim re Exposure Never Grieved**

While the plaintiff did grieve nearly every one of his baseless complaints several times

over, he never raised the complaint of being exposed to the elements on January 20, 2002 in a

grievance with correctional officials.   Connecticut inmates incarcerated out of state are informed

that the Interstate Compact Office will act as the Grievance Coordinator.  **Exs. Y Inmate**

**Handbook for Inmates Incarcerated Out of State; Z Milling Grievance Aff.**  As stated

above, Lynn Milling runs the Interstate Compact Office.  **Ex. Z.**

While in Nevada, the plaintiff grieved numerous issues about his transport to Nevada

from Connecticut.  **Ex. Z.**  His grievances claimed that he had been transferred out of state for

retaliatory reasons and claimed that Northern staff repeatedly threatened that he was being

transferred out of state and was going to be killed.  **Ex. Z.**  The plaintiff also complained in

grievances and in several letters that he is terrified of flying and did not know he would be flying

and did not want to be transported in the air again as it caused him to suffer severe shock and

mental anguish.  **Ex. Z.**  He stated in a level 2 grievance: "Alternative transportation is

demanded upon my return to CT."  **Ex. Z.**  The plaintiff further grieved that he was forced onto

the transport van and "maliciously forced onto the plane."  **Ex. Z.**  He also grieved that he did

not receive appropriate medical care prior to his transport and that he was restrained too tightly

during the transport.  **Ex. Z.**

Despite all of these many grievances regarding the transport from Connecticut to Nevada being filed by the plaintiff, there was never a single grievance filed related to having to stand in the cold for several hours in only an inmate jumpsuit.  **Ex. Z.**  The plaintiff therefore is precluded from bringing any claim about being exposed to the cold for several hours pursuant to the Prison Litigation Reform Act.

4.      **Claims as to Missing Legal Material**

As noted above, the plaintiff makes only vague and conclusory allegations regarding any of the named defendants involvement in his allegedly missing legal material, claiming "only the defendants and their agents could have stolen because the boxes were still sealed from CT."  S. Amnd. Com. ¶ 44.  The plaintiff has no specific allegation that any single defendant was involved in touching, packing or stealing any of his property, and certainly has not sufficiently alleged any conspiracy whereby they instructed others to interfere with his property.  Lynn Milling states in her attached Affidavit that her office ordered the property to be shipped directly from Northern to Nevada, and that when the plaintiff complained of missing property, she checked with Northern officials.  **Ex. H.**  Not a single defendant is alleged to have done anything with plaintiff's property, rather, plaintiff *surmises* that someone in Connecticut must have done something with his property as it came "sealed from Connecticut."  The plaintiff speaks in vague terms of lawsuits he could have brought against people whose names he forgets.  He also alleges that a habeas corpus action, # CV01-0447749S was negatively impacted, and yet Lynn Milling's Affidavit clearly states that the plaintiff was brought back for this very action as soon as a court date was scheduled in this matter.  **Ex. H.**  The plaintiff's vague and conclusory allegations are

subject to dismissal under Rule 12(b)(6), let alone subject to summary judgment. Personal involvement is simply not sufficiently alleged.

### 5. Lack of Access to Court

The plaintiff makes numerous allegations about his habeas corpus action also being negatively impacted by his presence in Nevada. The plaintiff claims that "his CT attorney has been forced to file one motion for continuance after another because this case could not proceed until the plaintiff's CT attorney first met with his client, the plaintiff, … in a strictly confidential setting and discussing all issues and going over the voluminous documents of the case." S. Amnd. Com. ¶ 48. A review of the state court docket sheet for this case reveals several things. First, the case was initiated by the plaintiff pro se over a year after he was transferred to Nevada. **Ex. AA, Docket Sheet.** Counsel was not appointed for the plaintiff until September of 2001, only six months prior to plaintiff's return to Connecticut in March of 2002. **Exs A; AA.** Plaintiff's counsel filed two motions for continuance (not unusual in any case). **Ex. AA.** As soon as a court date was scheduled, plans were made to return the plaintiff to Connecticut. **Ex. H.** The plaintiff's claims that he was denied access to Court due to his presence in Nevada is insufficient, and judgment should enter in defendants' favor on this issue as well.

### 6. Allegations regarding being shot at in Nevada

The plaintiff alleges unequivocally in his complaint that he was "shot in the back of his head, his back and his side" on January 9, 2002. S. Amnd. Com. ¶ 52. As a result of allegedly being shot in the back of his head, his back and his side, the plaintiff alleges that he suffers from post traumatic shell shock disorder and severe shell shock mental anguish. S. Amnd. Com. ¶ 50. He claims that he is "now permanently scarred due to the *shotgun pellets.*" S. Amnd. Com. ¶ 52.

He does not allege that the defendants had any notice that this would happen other than his many letters sent from Nevada, similar to the letters he has sent throughout his incarceration in Connecticut, that his life was in danger. Other than plaintiff's own claims, however, the plaintiff fails to claim and will fails to show any reason that Connecticut officials had any reason to suspect his life was in danger.

Indeed, there was an incident in Nevada in which other inmates were shot at with pellets in November of 2000. **Ex. BB  Grievances re Nevada Incident.** The plaintiff claimed in grievances filed from Nevada to Connecticut that "live bullets" had been fired when two inmates were fighting and he claimed then that he had "post traumatic shell shock disorder" then. **Ex. BB.** In the response to plaintiff's Level 1 grievance, it was noted that the plaintiff was "not shot at in the incident." **Ex. BB.** In his Level 2 grievance, the plaintiff responded, "Yes I was not directly shot at. I was eating, violated no rules, but was seriously harmed." **Ex. BB.** Nevada officials informed Connecticut that "bird seed" was all that was used in the incident, and that the plaintiff was not hit. **Ex. BB.**

There is no indication whatsoever in the plaintiff's medical records from Nevada that he sustained any significant injury, or any injury at all, from being shot while in Nevada. **Exs. T; U.** There are no clinical records whatsoever of the plaintiff being shot at or injured by pellet gun shot on or about January 9, 2002. **Exs. T; U.** There are physician's orders for the plaintiff for January 7, 2002, in which a mental health medication was ordered and physician's orders for January 14, 2002, for an antibiotic for a face infection was ordered, and no physician's orders or any other entry for January 9, 2002. **Exs. T 682; U.**

30

The important thing to keep in mind is that the plaintiff has not alleged any reason that the defendants had to think his life was in danger other than letters he claims he sent about trigger-happy Nevada correctional staff. These claims were not related to the incident with the birdseed, and in fact the plaintiff never sustained any actual injury while in Nevada. The plaintiff's admission in his level 2 grievance that he was never shot constitutes a party admission.

## C. LEGAL ARGUMENT

### 1. Standard of Review

In a motion for summary judgment, the burden is on the moving parties to establish that there are no genuine issues of material fact in dispute and that they are entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986); *White v. ABCO Engineering Corp.,* 221 F.3d 293, 300 (2d Cir. 2000), Fed. R. Civ. P. 56(c). A court must grant summary judgment "' if the pleadings, depositions, answers to interrogatories, and admissions on file, together with Affidavits, if any, show that there is no genuine issue as to any *material* fact.'" *Miner v. Glen Falls,* 999 F.2d 655, 661 (2d Cir. 1993) (emphasis added) (citation omitted).

A dispute regarding a material fact is genuine "'if the evidence is such that a *reasonable* jury could return a verdict for the nonmoving party.'" *Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d 520, 523 (2d Cir. 1992) (emphasis added) (quoting *Anderson,* 477 U.S. at 248, *cert. denied*, 506 U.S. 965 (1992). After discovery, if the nonmoving party "has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof," then summary judgment is appropriate. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

When a Motion for Summary Judgment is supported by documentary evidence and sworn Affidavits, the nonmoving party must present "significant probative evidence tending to support

the complaint." *Anderson,* 477 U.S. at 256 (*quoting First Nat. Bank of Ariz. V. Cities Serv. Co.,* 391 U.S. 253, 290 (1968).  A nonmoving party may not rely "on mere speculation or conjecture as to the true nature of the facts to overcome a Motion for Summary Judgment." *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 12 (2d Cir. 1986), *cert. denied*, 480 U.S. 932 (1987).

A party may not create a genuine issue of fact by presenting contradictory or unsupported statements.  *See Securities & Exchange Comm'n. v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir. 1978).  Nor may he rest on the "mere allegations or denials" contained in his pleadings. *Goenaga v. March of Dimes Birth Defects Found,* 51 F.3d 14, 18 (2d Cir. 1995);  *see also Ying Jing Gan v. City of New York,* 996 F.2d 522, 532 (2d Cir. 1993) (holding that party may not rely on conclusory statements or an argument that the Affidavits in support of the motion for summary judgment are not credible).  A self-serving Affidavit which reiterates the conclusory allegations of the complaint in Affidavit form is insufficient to preclude summary judgment.  *See Lujan v. National Wildlife Fed'n.,* 497 U.S. 871, 888 (1990).

In this case, the plaintiff makes numerous vague and conclusory allegations.  In *Flaherty v. Coughlin,*  the Second Circuit stated "[C]ertain claims are so easily made and can precipitate such protracted proceedings with such disruption of governmental functions that … detailed fact pleading is required."  567 F.2d at 553.

### 2.    Transfer Was Not For Retaliatory Reason

"Retaliation, though it is not expressly referred to in the Constitution, is nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights."  *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir. 2001) ("giv[ing] no credence to plaintiff's conclusory allegations" in a Motion to Dismiss ruling.  *Id.*)

The Second Circuit stated in *Dawes,* "[W]e note that Courts must approach prisoner claims of retaliation with skepticism and particular care." *Id.*, *citing Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir. 1983). The Court went on:

> This is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisons' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prison by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act…. Given that such adversity is an ever-present concomitant of prison life, the opportunities to characterize its manifestations as actionable retaliation are far greater than that for society at large.

239 F.2d at 491, internal cites omitted.

As *Dawes* dealt with a Rule 12(b)(6) motion, the Court stated, "To survive *summary dismissal,* retaliation claims must advance non-conclusory allegations establishing: (1) that the speech or conduct at issue was protected, (2) that the defendant[s] took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Id.* at 492.

The Eighth Circuit has noted that "the burden is on the prisoner to prove that but for an unconstitutional retaliatory motive the transfer would not have occurred." *Sisneros v. Nix,* 95 F.3d 749, 752 (8th Cir. 1996). In reversing the District Court's denial of summary judgment in a retaliatory transfer case, the Eighth Circuit likewise noted the "skepticism" appropriate in such cases. *Id.*, *citing Cochran v. Morris,* 73 F.3d 1310, 1317 (4th Cir. 1996) (*en banc).* The *Sisneros* Court noted that the fact that an inmate has filed lawsuits is less relevant than whether the lawsuits were what prompted the transfer as opposed to the behavior underlying the lawsuits. *Id.*

If the behavior underlying the lawsuits or even the filing of frivolous lawsuits motivated a transfer, the transfer is constitutional. *Id.*

In this case, the Court need not go that far to grant the defendants summary judgment as to the alleged retaliatory transfer. Ample evidence exists that the plaintiff was a management problem who was violent and destructive, thus providing Deputy Commissioner Coyle sufficient reason to order his transfer. Moreover, the lawsuits were served after Coyle's decision, and the grievances and letters plaintiff claims to have sent were not sent to Coyle.

In this case, there is simply no causal connection between the many lawsuits the plaintiff alleges he filed in Paragraphs 14 and 15 of his Second Amended Complaint and his transfer. At the time the *non-defendant* Deputy Commissioner Dennis Coyle ordered the transfer of the plaintiff out-of-state on March 31, 1999, the plaintiff's lawsuits had not been served! **Exs. G; I; J; K.** The other vaguely alleged acts of retaliation are not specific to the defendants, and were allegedly "through agents" of the defendant Armstrong, but the plaintiff has not and cannot claims or establish any link between Armstrong or the other defendants in this matter and the alleged retaliatory actions he refers to in his complaint. The many letters plaintiff and his mother sent to the defendant former Commissioner John Armstrong have no bearing on his transfer, which was ordered by the non-defendant Coyle based upon the plaintiff's disciplinary issues and poor adjustment to Connecticut prison life. **Ex. G.** The plaintiff has not alleged and certainly has no viable proof that Coyle was acting at Armstrong's behest in ordering the transfer of plaintiff, and should not be permitted to speculate on that subject.

**3.    Defendants Armstrong, Levesque and Milling had Insufficient Personal Involvement in Transfer Decision**

Section 1983 imposes liability for "conduct which 'subjects, or causes to be subjected,' the complainant to a deprivation of rights secured by the Constitution and laws." *Rizzo v. Goode* 423 U.S. 362, 370-71 (1976), *quoting* 42 U.S.C. §1983. Where damages are sought in a §1983 action, the defendant(s) must be responsible for the alleged constitutional deprivation. Thus, an allegation of personal involvement is a necessary prerequisite for a valid cause of action under §1983. *See, e.g., Gill v. Mooney*, 824 F.2d 192, 196 (2d Cir. 1987); *Johnson v. Glick,* 481 F.2d 1028, 1034 (2d Cir.), *cert. denied,* 414 U.S. 1033 (1973), *rev'd on other grounds, Graham v. Connor*, 490 U.S. 386 (1989); *McKinnon v. Patterson*, 568 F.2d 930 (2d Cir. 1977), *cert. denied,* 434 U.S. 1087 (1978). Consistent with the requirement that personal involvement is required for a claim under §1983, the Supreme Court has ruled that the general doctrine of *respondeat superior* does not suffice to state a claim under §1983. *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 692-95 (1978). Thus, in order to state a cognizable claim, the plaintiff must allege, and ultimately prove, "personal involvement of [the defendants] sufficient to support their liability for wrongful acts," not merely their "linkage in the chain of command." *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir. 1985).

Supervisory responsibility alone is not enough to confer exposure to liability. *Williams v. Smith*, 781 F.2d 313, 323 (2d Cir. 1986); *Williams v. Vincent,* 508 F.2d 541, 546 (2d Cir. 1974). A supervisory official may only be liable if it is alleged that he or she learned of the violation and failed to remedy the wrong, if he created or permitted the policy or wisdom under which the unconstitutional practices occurred, or if he was grossly negligent in managing subordinates who

caused the violation.  *Williams v. Smith,* 781 F.2d at 323-24; *Meriwether v. Coughlin,* 879 F.2d

1037 (2d Cir. 1989).  "A plaintiff must thus allege a tangible connection between the acts of the

defendants and the injuries suffered."  *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir. 1986).  An

official cannot be held liable merely because he or she occupies a high position in the prison

hierarchy.  *Colon v. Coughlin*, 58 F.3d 865, 874 (2d Cir. 1995).

    In this case, the plaintiff has not alleged sufficient personal involvement as to the

defendants Armstrong, Levesque or Milling in the decision to transfer the plaintiff.  The

documents provided by the defendants show unequivocally that the non-defendant Deputy

Commissioner Dennis Coyle made the decision to transfer the plaintiff.  Coyle's supervisor, John

Armstrong, cannot be held liable merely because he is a supervisor.  Coyle's subordinates,

Milling and Levesque were not the decision-makers, and thus cannot be held liable for any

alleged retaliatory motive in the transfer of the plaintiff as their sole motive was to carry out the

directions of their supervisor.

    While the *Dawes* decision correctly points out that the issue of retaliatory motive for a

transfer is certainly one of intent, in this case, summary judgment is highly appropriate.  None of

the named defendants made the decision, so their intent is not at issue.  Moreover, no causal

connection exists as the lawsuits were served after the decision was made to transfer the

plaintiff!

### 4.    No Deliberate Indifference to Serious Medical Need

    The Eighth Amendment protects inmates from deliberate indifference by prison officials

to their serious medical needs.  *Estelle v. Gamble,* 429 U.S. 97, 104 (1976).  To prevail on such a

claim, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate

indifference to serious medical needs." *Id.* at 106.  A prisoner must show intent to either deny or unreasonably delay access to needed medical care or the wanton infliction of unnecessary pain by prison personnel. *See id.* at 104-105.  Mere negligence will not support a section 1983 claim; the conduct of complained of must "shock the conscience" or constitute a "barbarous act". *McCloud v. Delaney,* 677 F. Supp. 230, 232 (S.D.N.Y. 1988), *citing United States ex rel. Hyde v. McGinnis,* 429 F.2d 864 (2d Cir. 1970).  A defendant will be liable under the Eighth only if his conduct is "repugnant to the conscience of mankind." *Tomarkin v. Ward,* 534 F. Supp. 1224, 1230 (S.D.N.Y. 1982) *quoting Estelle,* 429 U.S. at 105-06.

The civil rights statute was not meant to redress medical malpractice claims that can be adequately resolved under state tort law. *Tomarkin,* 534 F. Supp. at 1230-31.[2]  Thus, a claim of misdiagnosis, faulty judgment, or malpractice, without more to indicate deliberate indifference, is not cognizable under section 1983. *See McNabe v. Nassau County Medical Center,* 453 F.2d 698, 704 (2d Cir. 1971); *Tomarkin,* 534 F. Supp. at 1230.  In addition, mere disagreement with prison officials about what constitutes appropriate medical care does not state a claim cognizable under the Eighth Amendment. *See Hyde v. McGinnis,* 429 F.2d 864, 868 (2d Cir. 1970); *Corby v. Conboy,* 457 F.2d 251, 254 (2d Cir. 1972); *Ross v. Kelly,* 784 F. Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.), *cert. denied*, 506 U.S. 1040 (1992).

There are both subjective and objective components to the deliberate indifference standard. *See Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir. 1994), *cert. denied sub nom., Foote v. Hathaway,* 513 U.S. 1154 (1995).  The alleged deprivation must be "sufficiently serious" in objective terms. *Wilson v. Seiter,* 501 U.S. 294, 298 (1991).  *See also Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir. 1990) (Pratt, *J.*, dissenting: "'[The] serious medical need' requirement

---

[2]     It is the position of defendants that this cause of action would be insufficient even under a negligence standard in state court, as the facts described above make clear.

contemplates a condition of urgency, one that may produce death, degeneration, or extreme pain.").  The Second Circuit has identified several factors that are highly relevant to the inquiry into the seriousness of a medical condition: "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment of treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir. 1998)(citation & internal quotations omitted).  In addition, where the denial of treatment causes plaintiff to suffer a permanent loss or life-long handicap, the medical need is considered serious.  *See Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir. 2000).

        In addition to demonstrating a serious medical need to satisfy the objective component of the deliberate indifference standard, an inmate also must present evidence that, subjectively, the charged prison official acted with "a sufficiently culpable state of mind." *Hathaway*, 37 F.3d at 66 (citation omitted). "[A] prison official does not act in a deliberately indifferent manner unless that official *'knows of* and disregards an excessive risk to inmate health of safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Id.* (emphasis added) *(quoting Farmer v. Brennan,* 511 U.S. 825, 837 (1994)).

        In this case, neither the objective nor the subjective tests are met.  The plaintiff claims that three persons, former Commissioner Armstrong, former Warden Myers and Nurse Wollenhaupt, acted with deliberate indifference to his medical needs.   First of all, the medical records in this case do not establish that the plaintiff's condition was "sufficiently serious."  Not a single doctor in Nevada or in the 7 different correctional facilities plaintiff has been housed in has ever stated that the plaintiff has a serious medical need with regard to his back.  **Ex. T.**  This is not for lack of testing or medical attention, as x-rays were been ordered and the plaintiff has

been seen numerous times over the years with regard to his back complaints.  On the contrary, numerous medical personnel other than the defendants Myers and Wollenhaupt have stated that the plaintiff's objective symptoms do not comport with his subjective complaints, and the plaintiff has  been accused of exaggerating his complaint to get pain medication.  No medical personnel have ever stated that the plaintiff, with his two escapes, should be restrained in any special way.  The plaintiff has, in fact, received treatment for his back in that he has been monitored, has been x-rayed, and has received pain medications such as Tylenol and Motrin.  There is simply not, however, an objectively serious medical condition that either Myers or Wollenhaupt failed to perceive or were obligated to act on in any way.

The specific complaint against Myers is singular, that he  "failed to ensure that medical staff saw the plaintiff before his transfer out of state in order to determine whether or not the plaintiff had any medical issues which would have precluded his transfer out of state."  S. Amnd. Com. ¶ 29.  There is no evidence, however, that the plaintiff did have a medical issue which did preclude his transfer.  Moreover, while the plaintiff was not re-examined prior to his transfer, his medical records were reviewed by Nurse Kindness, who cleared the plaintiff for transfer.  The Warden is entitled to rely on Nurse Kindness' medical expertise.  There is no constitutional right to be physically examined immediately before being transferred.  Inmate Ziemba was physically examined numerous times between his admission to prison and his ultimate transfer, and a review of his records was sufficient.  Obviously, had an emergency situation arisen, the plaintiff could have sought medical care then.  His records were reviewed by Nurse Kindness on January 19, 2000, one day prior to his transfer on January 20, 2000.  They were initially reviewed by her in October of 1999.  There is simply nothing to substantiate plaintiff's claim that Warden Myers exhibited deliberate indifference to a known medical need of the plaintiff.  Nor is there any indication he was personally involved in medical decision-making regarding the plaintiff.

The same is true of Nurse Wollenhaupt.  First, she was not the nurse that cleared the plaintiff for transfer,   Thus, like the Warden, she was not personally involved and is entitled to summary judgment on that basis.  Nor was she personally involved in his treatment.  She was personally involved in answering his numerous medical grievances, but there was no indication in plaintiff's medical records of any serious medical condition going untreated.  Both Myers and Wollenhaupt are entitled to summary judgment on the claims against them regarding deliberate indifference to a serious medical condition.

The plaintiff's claims of deliberate indifference to serious medical needs of the plaintiff as to former Commissioner Armstrong are so vague and conclusory as to be laughable.  The plaintiff does not allege how Armstrong knew anything about his alleged serious medical needs or how he could have been involved in failing to care for them.

The plaintiff's allegations that Armstrong ignored his serious back problems are weak allegations of conspiracy.  As this Court is aware, the Second Circuit "has repeatedly held that complaints containing only conclusory, vague or general allegations of a conspiracy to deprive a person of his constitutional rights will be dismissed.  Diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct."  *Ostrer v. Aronwold,* 567 F.2d 551, 553 (2d Cir. 1977) (internal quotes, cites omitted).[3]  Thus, as the plaintiff has nothing to support his wild claims of conspiracy, the defendant Armstrong is entitled to summary judgment.

---

[3] *See also Cambriello v. County of Nassau,* 292 F.3d 307, 324 (2d Cir. 2002); *Koch v. Yunich,* 533 F.2d 80, 85 (2d Cir. 1976) ("Complaints relying on the civil rights statutes are plainly insufficient unless they contain some specific allegations of fact indicating a deprivation of civil rights, rather than state simple conclusions."

### 5.    No Excessive Force

The same is true of the plaintiff's claims that Armstrong's unnamed "agents" used excessive force on him on the morning of his transfer.  The plaintiff's claims that the three transport defendants put restraints on him too tightly, so tightly that they "cut into his spinal column".  First, handcuffing too tightly, without more, does not constitute a constitutional offense.  *Flores v. Palacios*, 381 F.3d 391; 397 (5th Cir. 2004); *Braun v. Baldwin,* 346 F.3d 761, 763 (7th Cir. 2003);  *Rodriguez v. Farrell,* 280 F.3d 1341, 1351 (11th Cir. 2002) ("painful handcuffing, without more, is not excessive force.");  *Carter v. Morris,* 164 F.3d 215, 219 n. 3 (4th Cir. 1999) (finding that plaintiff's allegation that she was handcuffed too tightly was "so insubstantial that it cannot as a matter of law support her claim" of excessive force);  *Foster v. Metro Airports Comm'n.,* 914 F.2d 1076, 1082 (8th Cir. 1990).

The Second Circuit has held that handcuffing too tightly in order to punish an inmate for litigiousness can constitute a constitutional violation.  *Davidson v. Flynn,* 32 F.3d 27, 30 (2d Cir. 1994).  In this case, however, the plaintiff's claims of cuffs so tight they cut into his spinal column are contradicted by the medical records upon intake in Nevada where all he complained of was an old back injury from 1998, two years prior to the transport.  **Ex. T 643, 652.** Certainly, the plaintiff's claims that his spinal column was "cut into" are false given his statements to medical personnel, not to mention the fact that if true, the plaintiff would be unable to walk.  The plaintiff's admissions in his medical records that his back injury was not related to his transport carries more weight than the allegations in his complaint to the contrary, and the

Court's time would be poorly spent litigating such claims when the plaintiff's own statements in medical records contradict the wild claims in his complaint.

### 6.    No Exhaustion of Cold Weather Claims

The plaintiff did not ever file a grievance regarding his exposure to the cold.  **Ex. Z.** Thus, the defendant are entitled to summary judgment on this issue.  The Prison Litigation Reform Act (hereinafter "PLRA") states, "No action shall be brought with respect to prison conditions under § 1983 … by a prisoner …, until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  The Second Circuit considers exhaustion an Affirmative Defense upon which a defendant bears the burden of proof.  *See Giano v. Goord,* 380 F.3d 670, 675 (2d Cir. 2004).  In this case, the defendants have met their burden by Lynn Milling's Affidavit that the plaintiff did grieve many issues related to the transport, most commonly his fear of flying, but he never grieved his alleged exposure to the elements of winter on January 20, 2000.  **Ex. Z.**   Thus, the plaintiff knew how to grieve matters and did so frequently.  The grievance process was available to him, and he used it on many issues, but not on this one. Accordingly, the defendants Bosquet, Matos and Davis are entitled to summary judgment as a matter of law on this issue.

### 7.    Missing Legal Property Issue

The Affidavit of Lynn Milling makes clear that neither she nor any of the other defendants had anything to do with packing the plaintiff's property, and any allegations regarding missing property cannot sufficiently be attributed to any of the defendants by anything other than the plaintiff's broad conclusory allegations of conspiracies and surmised involvement.

### 8.     Lack of Access to Connecticut Courts

The plaintiff's claim that he needed to be housed in Connecticut in order to have access to the Court's is not recognized under the law.  First of all, it is well-established that inmates may be housed in any state, and that there is no constitutional right to remain on one's state as an inmate.  *Olim v. Wakinekona,* 461 U.S. 238 (1983).  The Supreme Court has stated, "Among the hardships that may result from a prison transfer are separation of the inmate from home and family, separation from inmate friends, placement in a new and possibly hostile environment, ***difficulty in making contact with counsel,*** and interruption of educational and rehabilitative programs."  *Id.* at 248 n. 9 (emphasis added).  The Supreme Court was well aware that these things may result from the transfer of an inmate to a different state, and yet still permits inter-state transfers.  The plaintiff possesses no constitutional right to be able to meet in person with counsel.

In addition, in *Lewis v. Casey,* the Supreme Court clarified what is encompassed in an inmate's right of access to the courts and what constitutes standing to bring a claim for the violation of that right.  518 U.S. 343 (1996).  The Court held that to show that defendants violated an inmate's right of access to the courts, an inmate must allege facts demonstrating actual injury stemming from the defendants' unconstitutional conduct.  *Id.* at  349.

The plaintiff alleges a delay in his habeas proceeding by virtue of his stay in Nevada, but he does not allege any actual harm to his habeas.  Thus, this claims fails as well.

### 9.     No Notice to Defendants that Plaintiff was in any Danger in Nevada

The plaintiff admits in his grievance, attached, that he was never shot at.  Other than plaintiff's many non-specific and vague claims about his safety at every institution in which he is

43

housed, there was no specific reason for any defendant to suspect the plaintiff was in danger in

Nevada.  Nor was the plaintiff ever harmed in Nevada.  No constitutional violation exists for the

plaintiff in allegedly being shot given  his admission that he was not shot.  **Ex. BB.**  When an

incident did come to Lynn Milling's attention, she promptly investigated the circumstances.  **Ex.**

**BB.**  Moreover, as the attached caselaw indicates, the plaintiff is required to bring his lawsuits

about conditions in Nevada against Nevada officials.  *See, e.g., Jefferson v. Armstrong,*

3:02CV1575(JCH)(HBF), July 26, 2004, attached;  *Sekou v. Manson,* H-77-163, April 4, 1977;

attached.

### 10.    Qualified Immunity

The doctrine of qualified immunity protects government officials from civil suits arising

from the performance of their discretionary functions when that performance "does not violate

clearly established statutory or constitutional rights of which a reasonable person would have

known."  *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982);  *Lennon v. Miller*, 66 F.3d 416, 420-

21 (2d Cir. 1995);  *Oliviera v. Mayer,* 23 F.3d 642, 649 (2d Cir. 1994), *cert. denied,* 513 U.S.

1076 (1995).  This doctrine evolved as an accommodation between the need to provide private

redress when government officials abuse their position of public trust and the need to shield

officials who responsibly perform their duties from the costs of defending an action.  *Anderson v.*

*Creighton,* 483 U.S. 635, 638-39 (1987);  *Harlow v. Fitzgerald,* 457 U.S. at 814.  Assertion of

the privilege should be upheld unless the "contours of the right" were "sufficiently clear that a

reasonable official would understand that what he is doing violates that right."  *Anderson v.*

*Creighton,* 438 U.S. at 640.  The doctrine of qualified immunity for government officials serves

not only as a defense from liability, but also to dismiss an action when the plaintiff has failed to

claim the violation of clearly established law or to allege the clear violation of a constitutional

right. *Behrens v. Pelletier,* 516 U.S. 299, 306-307 (1996) ; *Jermosen v. Smith,* 945 F.2d 547,

553 (2d Cir. 1991), *cert. denied,* 503 U.S. 962 (1992).

In this case, all of the defendants are entitled to qualified immunity. The status of the law

is not such that a single one of the defendants would have known that his or her conduct with

regard to the plaintiff constituted deliberate indifference. *See, e.g., Alvarez v. Liscum,* 89 Fed.

Appx. 297 (2d Cir. 2004). While certainly no constitutional violations can be demonstrated by

plaintiff, none of the defendants violated any clearly established law, and summary judgment

should enter in their favor

### III.    CONCLUSION:

Judgment should enter in favor of all defendants for all of the reasons set forth above.


DEFENDANTS,
Lynn Milling, et al
RICHARD BLUMENTHAL
ATTORNEY GENERAL

BY:___/s/_____
Lynn D. Wittenbrink
Assistant Attorney General
Federal Bar No. ct08575
110 Sherman Street
Hartford, CT  06105
Telephone No.  (860) 808-5450
Fax No. (860) 808-5450
lynn.wittenbrink@po.state.ct.us

## <u>CERTIFICATION</u>

I hereby certify that a copy of the foregoing was mailed to the following on this 17th day

of February 2005:

      Inmate Duane Ziemba.
      #128963
      Garner Correctional Institution
      P.O.  Box 5500
      Newtown, CT
      06470

                                  ___/s/_____
                                  Lynn D. Wittenbrink
                                  Assistant Attorney General