# UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| Duane Ziemba | : | 3:02CV0258(DFM) |
| v. | : | |
| Lynn Milling, et al | : | February 17, 2005 |

### STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGEMENT

1.      The plaintiff has been in and out of the custody of the Department of Correction (hereinafter "DOC") for many years.  **Ex. A DOC RT 60 Screen.**   The plaintiff first entered prison in 1984 and began increasingly longer periods of incarceration thereafter.  **Ex. A.**

2.       In 1997, the plaintiff escaped from DOC custody while on Community Release status, and was subsequently returned to the custody of the Department of Correction with additional charges including larceny.  **Exs. A; E Inmate Master File portions; V Transport Request Packagee.**  Since 1997, Ziemba has continuously been in the custody of the Connecticut Commissioner of Correction.  **Ex. A.**   His current sentence does not expire until June of 2013.  **Ex. C RT 50 screen.**

3.      To say that the plaintiff has been a management problem for DOC officials would be an understatement.  The plaintiff has received 62 Disciplinary Reports during his incarceration, receiving his a Disciplinary Report for Destruction of Property the day just prior to his transfer to Nevada.  **Exs. D, RT 67; A.**

4.      The plaintiff's disciplinary history includes being found guilty by the Department of Correction of Assault on a DOC employee, three charges of Attempted Assault on a DOC

employee, fighting, numerous times being found guilty of threats, numerous times being found guilty of interfering with safety and security, and attempted escape in an incident separate from his escape from Community Release.  **Exs. A; D; E.**

5.    The plaintiff's initial terms of incarceration from 1984 until 1997 were relatively calm.  **Exs. A; D.**  Despite serving 5 separate periods of incarceration prior to being returned from his escape from Community Release in 1997, with those five separate periods totaling approximately six years and 9 months, the plaintiff received only 7 Disciplinary Reports prior to September of 1997.  **Exs. A; D.**

6.    In September of 1997, while housed at Cheshire, the plaintiff incurred Disciplinary Reports for fighting and Interfering with Safety and Security.  **Exs. A; D.**  On this date, the plaintiff refused to exit the shower and barricaded the shower entrance with plastic chairs.  **Ex. E, 139; F, Administrative Seg. file.**

7.    At this point, the plaintiff was temporarily transferred to Northern for a period of little over a month then back to a lower security level facility.  **Ex. A.**    While at Northern, the plaintiff received a hearing regarding placement in Administrative Segregation ("AS") at Northern, and his placement at Northern at that time was not authorized.  **Ex. E.**

8.    The plaintiff was warned at this point in time however, that "any additional Disciplinary Reports would result" in a review of his status.  **Exs. E 139; F.**  At this point the plaintiff started regularly incurring Disciplinary Reports at various facilities, garnering 10 Disciplinary Reports in a period of 7 months.  **Exs. A; D.**

9.    On August 11, 1998, the plaintiff attempted to escape, destroying the ceiling to his cell at Garner by kicking it and tampering with a fixture in the ceiling as well flooding the

cell and ripping the toilet out of the floor and using pipes from the toilet to hit the window to the cell.  **Exs. D, E 139; F; T 524.**

10.    The plaintiff had previously received criminal charges for a different escape, ultimately resulting in time being added to his term of incarceration.   **Ex. L, Transfer Request Package.**   On the same day he destroyed date, 8/11/98, the plaintiff was again transferred to Northern.  **Ex. A.**

11.    Despite being placed in the Phase Program at Northern in an effort to control his behavior, the plaintiff continued as a management problem at Northern.  **Ex. E.**

12.    The plaintiff continued to receive numerous Disciplinary Reports and be receive sanctions for the same at Northern throughout the remainder of 1998 and through 1999.  **Exs. D, E.  186-243.**  In November of 1998, the plaintiff was sentenced to a much longer sentence than previously, which certainly did not positively impact his institutional behavior.  **Exs. A; E 244; G 3/31/99 Letter from Dudley to Levesque.**

13.    In September of 1999, the plaintiff had another significant incident, and was internally charged with and convicted of  multiple counts of Attempted Assault on an Officer as well as other charges.  **Exs. D; E, 186-207.**   During this incident the plaintiff swung at Correctional Officers despite being restrained and was spitting.  **Ex. E 198, 204.**

14.    The plaintiff proved adept at slipping his restraints, including handcuffs, having to have them applied multiple times, breaking them on at least one occasion and attempting to break them on another.  **Ex. E 186, 187.**

15.    As he did so frequently, the plaintiff fought his disciplinary charges, pleading not guilty and appealing them all, typically accusing staff of a variety of improper behavior.  **Ex. E,**

**186-207.**  The plaintiff garnered yet another ticket in October of 1999 on a charge he incurred

frequently, Interfering with Safety and Security   **Ex. D.**

16.       Months before the plaintiff's series of disciplinary infractions in September and

October of 1999, however, the wheels had been set in motion to transfer the plaintiff out of

Connecticut due to the severe management problem he posed.  On March 31, 1999, then Deputy

Commissioner Coyle, who is not a defendant in this matter, issued instructions in a letter by

Correctional Counselor Dudley to Director Levesque, who is a defendant in this matter.  **Exs. G;**

**H, Milling Aff.; O Levesque Aff.**

17.       The letter stated:

Per instructions from Deputy Commissioner Coyle, I am requesting that the
process be initiated to transfer inmate Duane Ziemba …. to another jurisdiction.

Inmate Ziemba was sentenced for the final time on November 18, 1998, bringing
his total effective sentence to eighteen years, six months.  Presently he has no
litigation pending with the State.


In previous investigations, he has stated that he has no intention of complying
with the programming offered at Northern.  He continues to display an extremely
hostile and uncooperative attitude toward staff and has jeopardized the safety and
security of numerous facilities throughout the State.  We feel that this move
would not only benefit his personal safety, but also that of the Department.
**Ex. G.**

18.       Then Deputy Commissioner Coyle supervised the defendant Director Levesque,

who did then and continues to supervise Major Milling, also a defendant, who manages the

Interstate Compact Office for the Department of Correction.  **Ex. H.**  In a handwritten note by

Levesque to Milling which is contained on the only available copy of Ms. Dudley's letter,

Levesque instructs Milling:  "Lynn—Please prepare package, advise Coyle, CC Dudley".  **Exs.**

**G; H; O.**

19.     By this instruction, Milling understood that she was to prepare a Transfer Request Package regarding Ziemba to go to other states to see if any were willing to accept Ziemba as an inmate pursuant to the Interstate Corrections Compact. **Ex. H.**   Connecticut is a party to this compact along with numerous other states. **Ex. H.**

20.     The compact allows for participating states to move inmates among the states for a variety of reasons. **Ex. H.**  Participating states agree to treat transferred inmates in accord with state and federal law and transfers pursuant to this Compact are common. **Ex. H.**

21.     Deputy Commissioner Coyle's statement on March 31, 1999, that the plaintiff had no pending litigation against the State at that time, was accurate.  Exhibit I is a computerized printout of state court civil litigation initiated by persons named Ziemba going at least back to 1997. **Ex. I.**

22.     That document reflects only two state court actions by Ziemba, one initiated in 2001 and one initiated in 2004. **Ex. I.**  As for federal litigation, Exhibit J is a print out of all of the plaintiff's litigation in federal court reflecting 13 cases. **Ex. J.**

23.     Only four of those cases were brought prior to the year 2000, and a review of the docket sheets for those matters indicates that orders by the court directing the plaintiff to complete and return US Marshal 285 forms were not issued in any case until at least May of 1999. **Ex. K.  Thus, the decision was made to  transfer the plaintiff long before a single one of his many lawsuits were ever served, and could not have been in retaliation for any lawsuit filed by the plaintiff.**

24.     Milling sent an email to Correctional Counselor Sicilia on April 9, 1999, again before any lawsuits were served,  re "ziemba, duane 128963", reiterating that the Deputy

Commissioner Coyle had made the decision to transfer Ziemba:  "Fred received notification from Mr. Coyle's office that we shoul [sic]  pursue an involuntary transfer."  **Ex. N Transfer Communications.**

25.    Pursuant to Levesque's instruction, Milling did assemble a package to be distributed to other states.  **Exs. H; L.**  Milling sent a cover letter with the package to four states, Nevada, Florida, Oregon and Arizona.  **Exs. H; L.**

26.    The letters went to Oregon and Arizona on June 17, 1999.  **Exs. H; L**.  On July 21, 1999, Oregon indicated its unwillingness to accept Ziemba.  **Exs. H; M Transfer Request Correspondence.**

27.    Milling made a note on the copy of the letter to Arizona which states, "7/26/99 Per Call to AZ—slow in reviewing case  LM"  **Exs. H; L**.  Having received no positive response from either Arizona or Oregon by August 2, 1999, Milling sent the same package with a cover letter to Nevada and Florida..  **Exs. H; L.**

28.    As she had done previously, Milling noted Ziemba's poor institutional history as well as his history of escape attempts.  **Exs. L; M.**   In internal communication to her staff, Milling had requested that the packages go out to Florida and Nevada and had further indicated the issue was not urgent, stating "not a drop everything."  **Exs. N; H.**

29.    On August 17, 1999, Nevada corresponded with Milling, who received word on August 23, 1999 that Nevada would agree to accept Ziemba.  **Ex. R, 8/17/99 letter.**  By August 25, 1999, Milling sent a letter to Arizona indicating that "[O]ur above referenced inmate has been accepted by another state under the provisions of the Interstate Corrections Compact Agreement."  **Ex. M.**

30.     This exchange of correspondence indicates that, despite plaintiff's allegations, Nevada was one of several states contacted with regard to his transfer, and was not specifically sought out for any reason, nor was it even Connecticut's first request.

31.     Plaintiff's claims that he was sent to Nevada as it is the most dangerous prison in the country in order for him to be killed is not even remotely credible and is purely speculative, with no basis in fact whatsoever.

32.     On October 14, 1999, Milling corresponded with Nevada, stating that "Ziemba has been medically cleared to be transferred.  He recently had foot surgery and is wearing a special soft shoe.  He can only bear weight on his right heel.

33.     However, according to our medical unit, this is a temporary condition and he does not have any follow up appointments.  We will be making arrangements to move Mr. Ziemba to Nevada."  **Ex. S 10/14/99 letter.**

34.     On January 13, 2000, as plaintiff alleges, Milling communicated with Northern's Warden at the time, defendant Larry Myers.  **Ex. S, 1/13/00 letter.**  Milling indicated that placement for the plaintiff with Nevada had been secured and gave instructions to the Warden as to the travel arrangements.  **Ex. S.**

35.     Milling requested as follows:

Please make the necessary facility notifications regarding this matter including conferring with medical staff.  If there are any medical issues, which  would preclude his transfer at this time, including transfer by plane, please notifiy my office as soon as possible.  An updated Health Services Transfer Summary form should be completed and any pertinent medical/medications issues should be addressed.  If Mr. Ziemba requires medication, please see that a two-week supply is sent with him upon transfer.
**Ex. S.**

36.     In completing the transfer process, Milling was carrying out instructions by her superior and had no retaliatory or any other improper motive whatsoever. **Exs. G; H.** Milling was unfamiliar with Ziemba, having never had any direct contact with him prior to his transfer and having no reason to wish him ill. **Ex. H.**

37.     Levesque had even less to do with the transfer process, as all he did was pass Deputy Commissioner Coyle's instructions on to Milling. **Ex. O.** Levesque was familiar with Ziemba as a management problem, but had never had any direct contact with him prior to his transfer and had no reason to wish Ziemba ill. **Ex. O.**

38.     While the defendant Commissioner Armstrong did not order the transfer of the plaintiff to Nevada, he was aware of and approved the decision to transfer the plaintiff to another state based upon the plaintiff's poor institutional history and the safety threat he posed to staff**. Ex. P, Armstrong Aff.**

39.     It is often the case that an inmate who has exhibited extremely negative behavior in one state's correctional setting takes advantage of a fresh start with unfamiliar staff and inmates to improve his behavior. **Ex. P.** Such a transfer also gives Connecticut correctional staff a break from the plaintiff's destructive or threatening behavior. **Ex. P.**

40.     The transfer of the plaintiff was not to retaliate against him for any exercise of any First Amendment rights. **Exs. H; O; P.**

41.     The plaintiff was ultimately transferred back to Connecticut on March 28, 2002. **Ex. A.** He promptly complained to the Commissioner that his life was in danger in Connecticut at the Cheshire Correctional Institution, where he remained for two months before again being transferred back to Northern. **Exs. Q, 4/5/02 letter; A.**

42.     Despite the many alleged threats to his life and his safety prior to, during and after his stay in Nevada, the plaintiff is now living at Garner Correctional Institution.  **Ex. A.**

### 2.     Medical Issues Surrounding Transfer

#### a.     As to Nurse Patricia Wollenahaupt

43.     As set forth above, Milling corresponded with Nevada months before the transfer in January of 2000, stating on October 14, 1999, that "Ziemba has been medically cleared to be transferred.  He recently had foot surgery and is wearing a special soft shoe.  He can only bear weight on his right heel.  However, according to our medical unit, this is a temporary condition and he does not have any follow up appointments.  We will be making arrangements to move Mr. Ziemba to Nevada."  **Ex. S 10/14/99 letter.**

44.     Plaintiff's medical records do not indicate any significant problem with plaintiff's back.  **Exs. T; U.**  In March of 1998, long before his placement at Northern, yet while in custody, plaintiff's back was x-rayed twice with two different views after an altercation with an officer, and other x-rays to rule out back problems followed.  **Exs. T, Med. Records 190, 191, 192, 222, 224, 311, 313, 315; U, Blanchette Aff.**

45.     This altercation predated plaintiff's transfer to Nevada by 21 months.  **Exs. T 311; A; U.**   The conclusion reached by one radiologist was "Minimal anterior wedging of what appears to be T7, ? old Scheuermann's disease."  **Exs. T 190; U.**  Scheuermann's disease is a condition formed during growth years when the front of a disc or discs in the back do not grow at the same pace as the back.  **Ex. U.**

46.     The radiologist reading the report also said that the *minimal* wedging he noted could also be the product of trauma.  **Exs. T 190; U.**  Earlier that same month, another

radiologist reported that several "views of the lumbosacral spine reveal no evidence for acute fracture or dislocation.  No subluxation is evident."  **Exs. T 191; U.**

47.     Also on that date the radiologist concluded "No acute abnormality of the lumbosacral spine."  **Exs. T 192; U.**  He also noted "*mild"* narrowing at the cervical portion of the plaintiff's spine, but again concluded, "No acute fracture, subluxation or dislocation evident."  **Exs. T 192; U.**

48.     In April of 1998, approximately one month later, additional x-rays of the plaintiff's back (and sinuses) were taken.  **Exs. T 189; U.**  The conclusion again with regard to the Thoracic spine was "No significant interval change".  **Exs. T 189; U.**

49.     In May of 1998, a doctor ordered x-rays of plaintiff's back and the plaintiff complained about the x-rays.  **Exs. T 222; U.**  The plaintiff argued with medical staff that month, May of 1998, about the cause of his alleged back problems.  **Exs. T 221; U.**

50.     The plaintiff's doctor noted in May of 1998 that there were no acute changes on spinal x-rays but that the plaintiff was "unsatisfied with NSAID [anti-inflammatory medicine; Motrin] and bedrest."  **Exs. T 224, 228; U.**

51.     The treatment plan for plaintiff at that time was to continue conservative management and seek an orthopedic consult if an "adverse clinical change occurred."  **Exs. T 224; U.**  The doctor reporting indicated with regard to the plaintiff, "He feels pain is being ignored.  Litigation is highly likely."  **Exs. T, 228; U.**

52.     In June of 1998, plaintiff complained to medical staff, "You had x-rays of my back taken and told me they show nothing wrong.  I am again telling you something is seriously wrong."  **Exs. T 217; U.**

53.     Medical staff responded that the plaintiff had been seen 5 times from March to May of 1998 and had as of the last visit reported being comfortable after Motrin.  **Exs. T 217; U.**

54.     None of the defendants, including Nurse Wollenhaupt, the only medical staff defendant, were involved in any of decisions regarding treatment for the plaintiff's alleged back pain, although Nurse Wollenhaupt did respond to many of plaintiff's written requests regarding his alleged back pain and other issues by noting that the plaintiff had been seen by a doctor regarding his alleged back pain.  **Exs. T 218, 220, 221, 222, 223, 236, 238, 23, 240, 241, 242, 248, 249, 250, 251, 252, 253, 254 259, 273, 288, 289; U.**

55.     While there is certainly ample evidence that plaintiff complained about a back problem in 1998 and thereafter, there is likewise ample documentation that plaintiff was seen and treated for his alleged back problems by medical staff, that his problem was not ignored, Motrin and Tylenol were prescribed, and no acute or serious back injury was ever determined to exist.  **Exs. T 189, 190, 191, 192,  217, 218, 220, 221 222, 223, 228, 232, 236, 238, 239, 240, 241, 242, 248, 249, 250, 251, 252, 253, 254, 259 273, 288, 289, 301; U.**

56.     In terms of plaintiff's condition as perceived by medical staff, aside from his verbal complaint, the following was noted:

> No change in x-ray findings.
> Lumbar spine, no vertebral tenderness
> No limp in walk
> Lumbar pain L [left] sided more than thoracic spine level pain

**Exs. T 304; U.**

57.     These objective findings do not support plaintiff's claims about a serious back condition being mistreated by the application of restraints in the back.  **Ex. U.**

58.    Indeed, handcuffing a person in the back stretches the front, chest muscles, but would have no impact on the back one way or another.  **Ex. U.**

59.    On April 20, 1998, while at MacDougall-Walker Correctional Institution, the plaintiff wrote an Inmate Request Form in which he stated, "**I refused a medical trip today because my back seriously hurts.**  It is not humane for belly-chains to be raped [sic]  around my back with padlock behind my back.  I was 3:00 AM forced to refuse trip for this reason.  I am trying to heal not be hurt worse.  Can this be rescheduled with restraints being used <u>anyway</u> but raped [sic]  around my back.?"  **Exs. A; T 253; U.**

60.    Nurse Wollenhaupt stated to the plaintiff in response to his requests for , "Unfortunately, we can not deviate from the Administrative Directive.  You have no gross documented anomalies of the back.  We will try to rebook it if you agree to go according to the Administrative Directive."  **Exs. T 253; U.**

61.    Interestingly, plaintiff's request to be transported to a medical appointment at an "outside" hospital, UConn, with less restrictive restraints due to a purely subjective back problem predated by only months his escape attempt in August of 1998, and came after his criminal escape from DOC community placement.  **Exs. T 253; D; E 139; F.**

62.    In May of 1998, Dr. Silvis, not a defendant in this matter, noted the plaintiff, still at MacDougall, was "Upset because I noted in chart he refused to go to UCONN wearing certain restraint—This is simply a well documented fact that can not be covered-up to help I/M [inmate] Ziemba in his personal use of his medical file."  **Exs. A; T 296; U.**  The doctor further noted on that date that he had requested an orthopedic visit for the plaintiff "because  unsatisfied."  **Exs. T 297; U.**

63.     The doctor further noted, "Back pain complaints have been on-going since initial assault.  No change in x-rays c/ [with] no fx [fracture] ever seen." **Exs. T 297; U.**

64.     On a separate occasion in May of 1998, the plaintiff indicted to other medical staff that "He had not issues about the restraints except that he asked custody staff to be 'reasonable'" **Exs. T 301; U.**

65.     While in April of 1998, medical staff felt the plaintiff might have experienced a muscle spasm in his back, staff charted that the plaintiff himself aggravated this by working out. **Exs. T 307; U.**   Medical staff prescribed Motrin and Naproxen for plaintiff's pain from April through July of 1998. **Exs. T 390-392; U.**

66.     In August of 1998, the plaintiff's back was functioning well enough that he was able to rip the toilet off of the floor or wall of his cell at Garner, break a fixture in the ceiling and crawl up into the ceiling. **Exs. T 355, 540, 541; D; E 139; F; A; U.**

67.     The plaintiff was also able to destroy three sets of handcuffs at this time, breaking two sets at one time. **Exs. T 505, 541; U.**  This was considered an escape attempt. **Ex. D.**  At this point in time, the plaintiff was restrained and medical checked on him frequently, typically every two hours. **Exs. T 492-502; U.**

68.     During all of these checks, the plaintiff made no complaints of back pain, and medical staff noted on more than one occasion, "No c/o [complaints of] discomforts and no obvious s/s [signs or symptoms] of distress." **Ex. T 492-502.**

69.     The plaintiff was transferred to Northern at this time. **Ex. A.**  On September 8, 1998, plaintiff complained to staff that his back was not getting better and he was referred to "Sick Call" which is how inmates make a medical appointment. **Exs. T 485; U.**

70.     Also in September of 1998, another x-ray was taken of plaintiff's back.  **Exs. T 517; U.**  The results were provided by UConn radiology, who noted, "Some degenerative changes, no acute disease."  **Exs. T 517; U.**

71.     Clinical notes from September 11, 1998, reflect an extensive exam of plaintiff's complaints as related to his back vis-à-vis objective factors related to back pain.  **Exs. T 519, 520; U.**

72.     Seeing Nurse Clark, the plaintiff complained as follows:

C/O [complains of] back pain since August 12th – c/o lower back pain that goes down my right leg.  I/M states previous hx [history] of back problems c/ [with] hospitalization for back on March of 1998.
**Exs. T 520; U.**

73.     Obviously, this was a fabrication as the plaintiff's records from 1998 do not support any such "hospitalization for back on March of 1998."  **Exs. T 190-220; U.**

74.     Nurse Clark further noted, "gait observed steady;  **I/M slowly becoming verbally aggressive and demanding stating that he needs to be cuffed in front because he is 'so tall and my back hurts.'"  Exs. T 520 (emphasis added); U.**

75.     The plaintiff wanted to be cuffed in front a month after destroying a cell and mechanical restraints.  **Exs. T 253; U.**  Cuffing certain inmates in front is considered a potential security risk as inmates can swing the cuffs about, causing injury, and inmates have been known to attempt to strangle another or otherwise cause harm when cuffed in front.  **Ex. H.**

76.     Nurse Clark noted as follows:

Sick call process explained to i/m [inmate] and his hx [history] of refusing to see the MD also discussed c/ i/m [with inmate].  **No obvious distress or extreme discomfort noted; I/M denies being able to bend over to remove his sock for nurse to examine foot however custody staff reports that I/M is able to dress self and tend to … [illegible] c/ [with] no requests of assistance;**

14

As stated, inmate denies exercising in cell but muscle tone noted to be good; **I/M also initially stated that he was unable to move his toes but then stated he could move them; I/M noted to be able to propel body on and off exam table s/ [without] assistance and no c/o [complaints of] discomforts. I/M noted to bend at waist to sign inmate fee form c/ no c/o.**
**Exs. T 519 (emphasis added); U.**

77.    Nurse Clark concluded as follows: **"P) [Plan:] Continue c/ [with] cuff status in back per custody protocol." Exs. T 519 (emphasis added); U.**

78.    In late September of 1998, the plaintiff engaged in behavior leading correctional staff to extract him from his cell, behavior unlikely for someone with severe back pain. **Exs. T 483; U.**

79.    At this point in time, the plaintiff complained of "internal bleeding" which was never substantiated, but did not complain of back problems and "denie[d] any other medical concerns/issues." **Exs. T 483, 484; U.**

80.    In October of 1998, the plaintiff complained of several issues, including his back. **Exs. T 515; U.** Medical staff noted at that time that the plaintiff had **"full mobility, able to amb[ulate] c/o [without] difficulty, [Zero] s/o [signs of] trauma." Exs. T 515; U.** The plaintiff was given Motrin at this time. **Exs. T 515; U.**

81.    In February of 1999, the plaintiff complained of back pain and was seen by medical staff. **Exs. T 518; U.** Staff referred the plaintiff to the September 1998 x-rays, and the plaintiff requested follow-up x-rays, and was referred to "MDSC", sick call with a doctor. **Exs. T 518; U.**

82.    On March 4-5, 1999, the plaintiff was again in four-point restraints and thus assessed by medical staff at Northern. **Exs. T 456, 458; U.** The plaintiff did complain of lower back pain at this time, on some of the medical checks he received, along with numerous other

issues, although he did not always complain of back pain at this time.  **Exs. T 456-467, 476-477; U.**

83.     On March 9, 1999, the plaintiff had a physical incident with correctional staff after refusing an order and several medical issues were reported, none of which included his back.  **Exs. T 422; U.**

84.     A different nurse than the defendant, Nurse D. Kindness, completed the transfer summary with regard to the plaintiff on the date before his transfer.  **Exs. T 574; U.**  A medical transfer summary report is completed by reviewing a patient's medical records to note any significant medical history or current conditions or problems.  **Exs. X, Wollenhaupt Aff.; U.**

85.     Nurse Kindness noted for the plaintiff's "Current Conditions/Problems" that he had "Chronic/Varied/Non-Specific Complaints".  **Exs. T 574; U.**  Nurse Kindness noted the plaintiff's "Significant Medical History" as follows:  "Cheilectomoy R [right] foot 9/99, Mental Health Issues, Fx [fracture] Nose '97".  **Exs. T 574; U.**

86.     By completing this transfer summary, it was Nurse Kindness, not the defendant Nurse Patricia Wollenhaupt, who conducted the final review of plaintiff's medical history prior to his transfer.  **Exs. X; U.**

87.     As this transfer summary was completed, the request by Milling to Myers that medical issues be checked was carried out.  Obviously, Nurse Kindness noted no significant back injury nor did she note that any special treatment of the plaintiff's back was necessary, nor did she undertake any action to stop the plaintiff's transfer for a medical reason, as none was indicated in his medical chart.  **Exs. X; U.**

88.     There is no DOC policy or medical necessity for an inmate to be seen prior to a transfer out-of-state.  **Exs. U; X; U.**  It is DOC policy that an inmate's medical records are reviewed and a transfer summary prepared prior to transfer.  **Exs. U; X.**

89.     Nurse Kindness had also done a chart review and transfer summary on October 12, 1999, two days prior to Lynn Milling's letter to the Warden stating that the plaintiff had been medically cleared for transfer.  **Exs. S; T 575; U.**

90.     Also at this time, Nurse Kindness noted no significant back injury and did note the foot fracture.  **Exs. T 575; U.**  Another Nurse, Virginia Turner, had also completed a chart review and transfer summary regarding the plaintiff in April of 1999.  **Exs. T 576; U.**

91.     At this time, Nurse Turner noted a nasal fracture and foot issues for the plaintiff, but did not note any back injury or special treatment necessary with regard to plaintiff's back. **Exs. T 576; U.**

92.     The same was true on August 11, 1998 by a different nurse.  **Exs. T 577; U.** Different nurses, again not including Nurse Wollenhaupt, completed transfer summaries for the plaintiff in 1998, noting only that the plaintiff had a history of "back pain complaints" but noting no objective back injury.  **Exs. T 578; 579; U.**

93.     Nurse Wollenhaupt never cleared the plaintiff for transfer nor did she complete any transfer summary reports for the plaintiff.  **Exs. X; U.**  Qualified personnel did clear the plaintiff for his transfer to Nevada, and there was no medical reason for anyone, including Nurse Wollenhaupt, to intervene at any time.  **Exs. U; X.**

94.     The plaintiff's obviously lengthy medical chart reveals that he was seen frequently by various medical staff, including doctors, nurses and other professional on a frequent basis.  **Exs. T; U; X.**

95.     Nurse Wollenhaupt was certainly entitled to rely on the assessments of various medical staff, and as a nurse, was not in a position to second-guess the orders or assessments of physicians or other medical personnel who had physically examined the plaintiff.  **Ex. U; X.**

96.     Although Nurse Wollenhaupt was involved in answering the plaintiff's many grievances regarding his medical care, she was not responsible for medically clearing him for transfer, for the conditions of his transfer, or for making decisions about how to handcuff the plaintiff.  **Ex. X.**

97.     A review of the plaintiff's medical records reveals no objective back injury or any clinical reason to handcuff him in front, or any condition that should prevent him from car or air travel.  **Exs. U; T; X.**

98.     When the plaintiff arrived in Nevada, he continued to complain of an alleged back injury from 1998.  **Ex. W, 12/28/00 correspondence.**   Prior to ever receiving any medical records from Connecticut, the doctor in Nevada opined, "[P]art of his problem is that he is trying to get drugs, and they are not giving them to him.  He is receiving medication for the pain, but not heavy duty  drugs."  **Ex. W.**

99.     While the plaintiff was in Nevada, he did continue to complain of back pain but no treatment other than Tylenol or Motrin was prescribed, and the plaintiff was never restricted in being restrained or in travel in any way by any medical professional in Nevada.  **Exs. T 651-840; U.**

100.    Thus, no doctor, nurse or other medical professional in either Connecticut or Nevada has ever diagnosed the plaintiff with any back condition which would prohibit him from traveling, and Nurse Wollenhaupt never ignored any serious medical need of the plaintiff. **Exs. T; U; X.**

101.    The plaintiff's alleged back pain does not constitute a "serious medical condition". **Exs. T; U.**

102.    Even the plaintiff did have a serious medical condition, as set forth above, Nurse Wollenhaupt had no personal involvement in clearing the plaintiff for transfer, nor did she have any responsibility in that regard.

### 3.    Claims as to Transport Personnel

### a.    Alleged Excessive Force

103.    There is no indication whatsoever of any serious spinal column injury or any spinal injury at all to the plaintiff before or after his transport to Nevada in his medical records from either Nevada or Connecticut. **Exs. T; U.** Nor is there any single entry in the plaintiff's voluminous medical records from both Nevada and Connecticut in which the plaintiff seeks medical care related to nerve problems with his hands or wrists. **Exs. T; U.**

104.    The plaintiff's Nevada medical records include a "Master Problem List" starting with his arrival in February of 2000. **Ex. T 643.** This list mentions only reported back pain from the "3/1998 injury", the right foot, and "[decreas]ed hearing in left ear." **Exs. T 643; U.**

105.    No ear infection or recent back injury or hand injury is noted whatsoever. **Exs. T 643; U.** Indeed, the February 8, 2000 intake notes states "Hx [history] per i/m [inmate]: ***Back injury prior to incarceration."*** **Exs. T 643 (emphasis added); U.**

19

106.    In June of 2000, medical professionals noted with regard to the plaintiff's alleged back pain that it was his or her assessment:  "muscular/skeletal back pain  …subjective complaints only—no objective physical exam findings."  **Exs. T 652; U.**

107.    The plaintiff cannot substantiate his claims that he was transported with excessive force or that he sustained any physical injury from the manner in which he was transported in January of 2000.

**b.      Claim Regarding Exposure to the Elements**

108.    There is no indication whatsoever of any ear infection caused by exposure to the elements on January 20, 2000 in the plaintiff's medical records from Connecticut or Nevada. **Exs. T; U.**

109.    The plaintiff's Nevada medical records include a "Master Problem List" starting with his arrival in February of 2000.  **Ex. T 643.**  This list mentions only the reported back pain from the "3/1998 injury", the right foot, and "[decreas]ed hearing in left ear."  **Exs. T 643; U.**

110.    No ear infection is noted whatsoever.  **Exs. T 643; U.**  In fact , both of plaintiff's ears were examined on February 8, 2000 and determined to be "WNL [Within normal limits]" with "0 edema [no swelling]".  **Exs. T 653; U.**

111.    Most importantly, the doctor in Nevada stated on February 15, 2000, "***No evidence of infection."***  **Exs. T 653; U.**  The earlier health assessment of the plaintiff done upon arrival on February 8, 2000 in Nevada showed the ears to be "normal."  **Exs. T 736-737; U.**

### c.     Claim re Exposure Never Grieved

112.     While the plaintiff did grieve nearly every one of his baseless complaints several times over, he never raised the complaint of being exposed to the elements on January 20, 2002 in a grievance with correctional officials.

113.     Connecticut inmates incarcerated out of state are informed that the Interstate Compact Office will act as the Grievance Coordinator.  **Exs. Y Inmate Handbook for Inmates Incarcerated Out of State; Z Milling Grievance Aff.**  As stated above, Lynn Milling runs the Interstate Compact Office.  **Ex. Z.**

114.     While in Nevada, the plaintiff grieved numerous issues about his transport to Nevada from Connecticut.  **Ex. Z.**  His grievances claimed that he had been transferred out of state for retaliatory reasons and claimed that Northern staff repeatedly threatened that he was being transferred out of state and was going to be killed.  **Ex. Z.**

115.     The plaintiff also complained in grievances and in several letters that he is terrified of flying and did not know he would be flying and did not want to be transported in the air again as it caused him to suffer severe shock and mental anguish.  **Ex. Z.**

116.     He stated in a level 2 grievance: "Alternative transportation is demanded upon my return to CT."  **Ex. Z.**  The plaintiff further grieved that he was forced onto the transport van and "maliciously forced onto the plane."  **Ex. Z.**

117.     He also grieved that he did not receive appropriate medical care prior to his transport and that he was restrained too tightly during the transport.  **Ex. Z.**

118.     Despite all of these many grievances regarding the transport from Connecticut to Nevada being filed by the plaintiff, there was never a single grievance filed related to having to stand in the cold for several hours in only an inmate jumpsuit.  **Ex. Z.**

119.     The plaintiff therefore is precluded from bringing any claim about being exposed to the cold for several hours pursuant to the Prison Litigation Reform Act.

**4.     Claims as to Missing Legal Material**

120.     Lynn Milling states in her attached Affidavit that her office ordered the property to be shipped directly from Northern to Nevada, and that when the plaintiff complained of missing property, she checked with Northern officials.  **Ex. H.**

121.     Lynn Milling's Affidavit clearly states that the plaintiff was brought back for this very action as soon as a court date was scheduled in this matter.  **Ex. H.**  The plaintiff's vague and conclusory allegations are subject to dismissal under Rule 12(b)(6), let alone subject to summary judgment.  Personal involvement is simply not sufficiently alleged.

**5.     Lack of Access to Court**

122.     A review of the state court docket sheet for this case reveals several things.  First, the case was initiated by the plaintiff pro se over a year after he was transferred to Nevada.  **Ex. AA, Docket Sheet.**  Counsel was not appointed for the plaintiff until September of 2001, only six months prior to plaintiff's return to Connecticut in March of 2002.  **Exs A; AA.**

123.     Plaintiff's counsel filed two motions for continuance (not unusual in any case).  **Ex. AA.**  As soon as a court date was scheduled, plans were made to return the plaintiff to Connecticut.  **Ex. H.**

124.    The plaintiff's claims that he was denied access to Court due to his presence in Nevada is insufficient, and judgment should enter in defendants' favor on this issue as well.

**6.      Allegations regarding being Shot in Nevada**

125.    Connecticut officials had no reason to suspect his plaintiff's life was in danger in Nevada, his frequent and bizarre allegations notwithstanding.

126.    Indeed, there was an incident in Nevada in which other inmates were shot at with pellets in November of 2000.  **Ex. BB  Grievances re Nevada Incident.**

127.    The plaintiff claimed in grievances filed from Nevada to Connecticut that "live bullets" had been fired when two inmates were fighting and he claimed then that he had "post traumatic shell shock disorder" then.  **Ex. BB.**

128.    In the response to plaintiff's Level 1 grievance, it was noted that the plaintiff was "not shot at in the incident."  **Ex. BB.**  In his Level 2 grievance, the plaintiff responded, "Yes I was not directly shot at.  I was eating, violated no rules, but was seriously harmed."  **Ex. BB.**

129.    Nevada officials informed Connecticut when Connecticut investigated that "bird seed" was all that was used in the incident, and that the plaintiff was not hit.  **Ex. BB.**

130.    There is no indication whatsoever in the plaintiff's medical records from Nevada that he sustained any significant injury, or any injury at all, from being shot while in Nevada. **Exs. T; U.**

131.    There are no clinical records whatsoever of the plaintiff being shot at or injured by pellet gun shot on or about January 9, 2002.  **Exs. T; U.**  There are physician's orders for the plaintiff for January 7, 2002, in which a mental health medication was ordered and physician's

orders for January 14, 2002, for an antibiotic for a face infection was ordered, and no physician's

orders or any other entry for January 9, 2002.  **Exs. T 682; U.**

132.    The plaintiff was never shot in Nevada.


DEFENDANTS,
Lynn Milling, et al
RICHARD BLUMENTHAL
ATTORNEY GENERAL

BY:___/s/_____
Lynn D. Wittenbrink
Assistant Attorney General
Federal Bar No. ct08575
110 Sherman Street
Hartford, CT  06105
Telephone No.  (860) 808-5450
Fax No. (860) 808-5450
lynn.wittenbrink@po.state.ct.us

## **CERTIFICATION**

I hereby certify that a copy of the foregoing was mailed to the following on this 17th day

of February 2005:

      Inmate Duane Ziemba.
      #128963
      Garner Correctional Institution
      P.O.  Box 5500
      Newtown, CT
      06470

                     _/s/_____

                     Lynn D. Wittenbrink
                     Assistant Attorney General